**GRISWOLD INSULATION COMPANY, INC., et al., Plaintiffs,**

v.

**LULA COTTON PROCESSING COMPANY, INC., et al., Defendants.**

No. 80–3096.

United States District Court,
M. D. Tennessee,
Nashville Division.

June 18, 1982.

---

Stephenson, Lackey & Waite, Nashville, Tenn., for plaintiffs.

William Eason, Kilpatrick & Cody, Atlanta, Ga., for Lula Cotton Processing Co., Inc.

Jay S. Bowen, Bass, Berry & Sims, Nashville, Tenn., Royce Taylor, Murfreesboro, Tenn., for U. S. Testing Co.

R. B. Parker Jr., and Donald P. Paul, Parker, Nichol & Finley, Nashville, Tenn., for defendants Lula Cotton Processing Co., Inc., Kelsul, Inc., and Kelley.

## MEMORANDUM

WISEMAN, District Judge.

Plaintiff, Griswold Insulation Co., Inc. [Griswold], a Tennessee corporation, filed this action alleging breach of contract, breach of express and implied warranties, tortious misrepresentation, negligence, and violation of the Consumer Product Safety Act [CPSA], 15 U.S.C. § 2051 *et seq.*, arising out of the purchase of cellulose insulation that allegedly did not conform to minimum safety standards. Corporate defendants, Kelsul, Inc., and Lula Cotton Processing Co., Inc. [Lula], filed a motion for partial summary judgment, pursuant to Rule 56, F.R.Civ.P., contending (1) that the CPSA protects only ultimate consumers and does not extend to intermediary purchasers like plaintiff, and (2) that the CPSA provides protection only in instances where bodily injury results and not for purely economic injuries like those alleged by plaintiff. Defendant Paschall, president of defendant Lula, Inc., and defendant Kelley, president of defendant Kelsul, Inc., also seek summary judgment. Defendant Paschall individually asserts that this Court lacks in personam jurisdiction over him since he is a nonresident and allegedly has no personal contacts with the forum state or the transaction here in question. Both defendant Paschall and defendant Kelley contend that as corporate officers they are not subject to personal liability, in a suit by a third party, for corporate mismanagement. Both defendants Paschall and Kelley additionally seek partial summary judgment on the same grounds regarding the CPSA as the corporate defendants, if this Court denies their particularized motions.

For reasons stated below, the Court finds that defendant Paschall lacks the necessary minimum contacts for this Court to exercise jurisdiction over him, and accordingly, he is dismissed from this action. The Court also finds that defendant Kelley is subject to personal liability for tortious misrepresentation, which is distinguishable from corporate mismanagement, and therefore denies his motion for summary judgment. The Court moreover concludes that defendants' interpretation of the CPSA is incorrect and denies all defendants' motion for partial summary judgment on that ground as well.

*Facts*

Plaintiff, an insulation installer and wholesaler, alleges that it entered into a contract with defendant Kelsul, Inc., a consulting and marketing firm that represented defendant Lula, to distribute insulation products manufactured by defendant Lula. In tests conducted prior to any purchases, plaintiff determined that defendant Lula's product, Fibe-R, was incompatible with equipment commonly used to blow insulation into attics. For this reason, defendant Kelley supplied plaintiff with a sample of a new insulation product to test for compatibility with plaintiff's blowing equipment. Defendant informed plaintiff at that time that the new material, Fibe-R-C, had not been certified as being in compliance with government safety standards, but that he would notify plaintiff upon the issuance of such certification. In a second series of tests, plaintiff found Fibe-R-C to be compatible with its equipment.

Plaintiff further alleges that in early January 1980 defendant Kelley did in fact notify plaintiff that defendant United

States Testing Co., Inc.,[1] had certified that Fibe-R-C complied with all government standards and requirements. Thereafter, in the first weeks of January 1980, plaintiff received three tractor trailer shipments of Fibe-R-C, subsequently selling it wholesale to other installers and using Fibe-R-C for its own installations.

In an effort to promote the use of Fibe-R-C, plaintiff took a sample of Fibe-R-C to a TVA district office to demonstrate the potential usefulness of Fibe-R-C. TVA officials tested Fibe-R-C by exposing it to an open flame, causing it to burn. Further testing confirmed that Fibe-R-C did not comply with TVA safety standards. TVA officials required the cessation of all sales of Fibe-R-C and its removal from all places where it had been used.

Plaintiff seeks compensatory and punitive relief, claiming that defendants' conduct caused irreparable harm to plaintiff's business and a concomitant economic injury. Plaintiff relies on four grounds to support its claim: (1) breach of express and implied warranty; (2) negligence; (3) misrepresentation; and (4) violation of the CPSA.

Both individual defendants Kelley and Paschall seek summary judgment pursuant to Rule 56, F.R.Civ.P., and argue that they are not subject to personal liability to third parties such as plaintiff for actions taken in their capacity as corporate officers. Additionally, defendant Paschall contends that this Court lacks in personam jurisdiction over him. The two corporate defendants, Kelsul, Inc., and Lula, Inc., and the individual defendants seek partial summary judgment pursuant to Rule 56, F.R.Civ.P. They contend that the CPSA is limited to actions by consumers to recover for bodily injury and does not extend to wholesalers complaining of purely economic injuries.

### Jurisdiction Over Defendant Paschall

Defendant Paschall asserts that he lacks the requisite minimum contacts with Tennessee for this Court to exercise jurisdiction over him. In his affidavit, defendant Paschall stated that he is completely unrelated to the underlying transactions in this case and that he has never transacted any business in Tennessee either in his capacity as president of Lula or personally. Defendant Paschall cites *Warren v. Dynamics Health Equipment Mfg. Co., Inc.*, 483 F.Supp. 788 (M.D.Tenn.1980), in which this Court dismissed claims against two individual defendants and noted that absent factors militating towards piercing the corporate veil, mere ownership of stock is not a sufficient basis for attributing the forum contacts of a corporation to individual defendants. *Id.* at 792. As plaintiff conceded in its brief in opposition to defendants' motion for summary judgment, defendant Paschall's capacity as president of Lula, without more, does not provide an adequate basis for attributing defendant Lula's forum contacts to defendant Paschall.

The Court has reviewed the pleadings in this action and, based on that review, must conclude that defendant Paschall has no contacts with Tennessee, other than his association with defendant Lula, that would justify the exercise of jurisdiction over him. The Court consequently lacks personal jurisdiction over defendant Paschall and accordingly dismisses him from this action.[2]

### Defendant Kelley's Motion for Summary Judgment

Relying on Restatement (Second) of Torts section 552c, plaintiff argues that de-

---

1. Defendant United States Testing Co., Inc., has not filed for summary judgment. On February 27, 1981, in a pretrial conference held pursuant to Rule 16, F.R.Civ.P., defendant United States Testing asserted that prior to April 14, 1981, it had neither tested nor certified Fibe-R-C; nor did it orally or in writing represent that Fibe-R-C had been approved or certified; nor did it authorize the use of its seal of approval with reference to Fibe-R-C. (Pretrial Order, February 27, 1981).

2. Although defendant Paschall styled his overall motion as a motion for summary judgment, this component of the motion is actually in the nature of a Rule 12(b)(2) motion to dismiss, and the Court has treated it as such.

fendant Kelley is subject to personal liability for misrepresentation. Defendant Kelley, citing *Merriman v. Smith*, 599 S.W.2d 548 (Tenn.App.1979), contends that plaintiff must establish the existence of an independent duty running from himself to plaintiff, separate and distinct from his duty to defendant Kelsul, as a prerequisite to imposition of personal liability for corporate mismanagement.

Defendant Kelley has failed to distinguish corporate mismanagement from tortious misrepresentation.[3] Defendant has accurately characterized that portion of *Merriman* that pertains to corporate mismanagement. Defendant Kelley has overlooked the fact, however, that the *Merri-*

*man* court went further and addressed circumstances in which corporate directors[4] are subject to personal liability. As the *Merriman* court noted, "[A] corporate director may be individually and personally liable to a third party to whom he furnishes a false corporate financial statement where such person suffers damages in reliance thereon."[5] 599 S.W.2d at 557. Still remaining as genuine issues of material facts in this case with regard to this claim are (1) whether defendant Kelley made representations that were false, *see* n.1, and (2) whether plaintiffs reasonably relied on those representations. Given the above considerations, this issue is not ripe for disposition by summary judgment. Consequently, the

3. Similarly, defendant has failed to distinguish theories of tortious and contract liability. The very case cited by defendant, *Nunnelly v. Southern Iron Co.*, 94 Tenn. 397, 29 S.W. 361 (1895), to support his argument that corporate officers are not liable for contracts made in their capacity as corporate officers unless they so stipulate, also supports plaintiff's theory that corporate officers are subject to tort liability for misrepresentation. "The agents of a corporation are clearly liable for their tortious acts. They are therefore liable for any injury to the property of others, ... 1 Mor.Priv.Corp. § 569." *Id.* 29 S.W. at 366–67. Furthermore, although the *Merriman* court applied Restatement (Second) of Torts section 552, which provides in pertinent part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, *if he fails to exercise reasonable care or competence in obtaining or communicating the information....* (emphasis added),

as opposed to Restatement (Second) of Torts section 552c, which provides in pertinent part:

(1) one who, in a sale, rental or exchange transaction with another, makes a misrepresentation of a material fact for the purpose of inducing the other to act or to refrain from acting in reliance upon it, is subject to liability to the other for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation, *even though it is not made fraudulently or negligently.* (emphasis added),

the differences between the two sections are not relevant to the issues presented in defend-

ant Kelley's motion for summary judgment. In other words, defendant Kelley is subject to personal liability regardless of whether the standard of review is one of negligent misrepresentation, section 552, or one of innocent misrepresentation, section 552c.

4. In the instant case, defendant Kelley is subject to personal liability arising out of his actions in the role of corporate president, not as a director as in *Merriman*. This distinction, however, is insignificant. In *Cooper v. Cordova Sand & Gravel Co., Inc.*, 485 S.W.2d 261, 271 (Tenn.Ct.App.1971), cited by plaintiff, the Tennessee Court of Appeals imposed personal liability upon a corporation president for misrepresentation.

5. In *Merriman* the court held that directors are not liable for misrepresentation for statements made in the form of a warranty, unless the statement of warranty was made in the director's personal capacity. 599 S.W.2d at 557. Defendant Kelley contends that his statements were warranties made in his capacity as president of defendant Kelsul and, therefore, as in *Merriman*, personal liability does not attach. Although the representation, by defendant Kelley, that Fibe-R-C complied with federal safety standards could be characterized as a warranty for which personal liability would not attach, the representation that defendant United States Testing Co., Inc., had tested Fibe-R-C *is not in the nature of a warranty.* A statement concerning whether a party conducted tests is not a warranty; a warranty is derived from statements concerning product performance, not whether tests were conducted. A statement concerning testing merely provides support and credibility to an assertion of product reliability. For this reason, defendant Kelley is subject to personal liability.

Court denies defendant Kelley's motion for summary judgment.

### The Consumer Product Safety Act

Plaintiff alleges that defendants have violated section 2082 [6] of the CPSA, which basically provides a safety standard for cellulose insulation. Relying on section 2072,[7] which provides a private cause of action for injuries resulting from a "knowing" violation of a safety standard promulgated by the Consumer Product Safety Commission, plaintiff argues that it may recover because its injury resulted from defendants' violation of section 2082. Plaintiff argues that this Court should attribute the literal meaning of the phrase "any person" when applying section 2072, thereby including intermediary consumers, like plaintiff, as well as ultimate consumers within the ambit of section 2072. Plaintiff also argues that the "injury" for which section 2072 provides a means for redress includes economic as well as physical injury.

To support their contention that the CPSA is inapplicable in the instant case,

**6.** 15 U.S.C. § 2082 (1976 & Supp. IV 1980) provides in relevant part:

(a)(1) Subject to the provisions of paragraph (2), on and after the last day of the 60-day period beginning on July 11, 1978, the requirements for flame resistance and corrosiveness set forth in the General Services Administration's specification for cellulose insulation. HH–I–515C (as such specification was in effect on February 1, 1978), shall be deemed to be an interim consumer product safety standard which shall have all the authority and effect of any other consumer product safety standard promulgated by the Commission under this chapter. During the 45-day period beginning on July 11, 1978, the Commission may make, and shall publish in the Federal Register, such technical, nonsubstantive changes in such requirements as it deems appropriate to make such requirements suitable for promulgation as a consumer product safety standard. At the end of the 60-day period specified in the first sentence of this paragraph, the Commission shall publish in the Federal Register such interim consumer product safety standard, as altered by the Commission under this paragraph.

(2) The interim consumer product safety standard established in paragraph (1) shall provide that any cellulose insulation which is produced or distributed for sale or use as a consumer product shall have a flame spread rating of 0 to 25, as such rating is set forth in the General Services Administration's specification for cellulose insulation, HH–I–515C.

(3) During the period for which the interim consumer product safety standard established in subsection (a) of this section is in effect, in addition to complying with any labeling requirement established by the Commission under this chapter, each manufacturer or private labeler of cellulose insulation shall include the following statement on any container of such cellulose insulation: "ATTENTION: This material meets the applicable minimum Federal flammability standard. This standard is based upon laboratory tests only, which do not represent actual conditions which may occur in the home". Such statement shall be located in a conspicuous place on such container and shall appear in conspicuous and legible type in contrast by typography, layout, and color with other printed matter on such container.

**7.** 15 U.S.C. § 2072 (1976 & Supp. IV 1980) provides in relevant part:

(a) Any person who shall sustain injury by reason of any knowing (including willful) violation of a consumer product safety rule, or any other rule or order issued by the Commission may sue any person who knowingly (including willfully) violated any such rule or order in any district court of the United States in the district in which the defendant resides or is found or has an agent, shall recover damages sustained, and may, if the court determines it to be in the interest of justice, recover the costs of suit, including reasonable attorneys' fees (determined in accordance with section 2060(f) of this title) and reasonable expert witnesses' fees: *Provided*, That the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, unless such action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

(b) Except when express provision is made in a statute of the United States, in any case in which the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

(c) The remedies provided for in this section shall be in addition to and not in lieu of any other remedies provided by common law or under Federal or State law.

defendants rely on two distinct grounds. First, defendants argue that the CPSA provides a remedy only in cases involving bodily injury and not in cases involving purely economic injuries such as those alleged by plaintiff. Rejecting plaintiff's broad interpretation of the term "injury" as used in section 2072, defendants contend that section 2052(a)(3) of the CPSA actually defines the scope of recovery. Section 2052(a)(3) provides that "the term 'risk of injury' means a risk of death, personal injury, or serious or frequent illness." Defendants infer from that section that recovery under the CPSA is limited to individuals whose injuries are within the meaning of section 2052(a)(3). Second, defendants argue that plaintiff is not a proper plaintiff under the CPSA because under the CPSA only ultimate consumers are proper plaintiffs. In other words, defendants argue that intermediary consumers, parties in the chain of distribution connecting manufacturers and ultimate consumers, may not recover under the CPSA.

As the debate between the parties indicates, the CPSA facially provides no quick resolution of the issues raised here. Consequently, the Court has undertaken a review of the CPSA's legislative history in search of the answer. Having so reviewed the CPSA's genesis, the Court concludes that defendants' motion for partial summary judgment should be denied. The legislative history of the CPSA demonstrates a congressional intent to permit parties like plaintiff here to sue for economic injuries.

In 1972, in response to a study that disclosed that 20 million Americans were injured in their homes annually,[8] Congress enacted the Consumer Product Safety Act authorizing the establishment of an independent agency for the purpose of regulating product safety by promulgating uniform safety standards. *See* 15 U.S.C. § 2051 (1976); S.Rep.No.92–835, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Ad.News 4573, 4574. Under the Act, the Consumer Product Safety Commission is empowered to establish by rule consumer product safety standards that set forth product performance requirements.[9] In addition, the CPSA provides a full panoply of remedies for the violation of a consumer product safety standard including civil[10] or criminal[11] penalties or injunctive relief.[12] The Act also provides for private enforcement of consumer product safety standards through an action filed in a United States district court,[13] and a private cause of action for injuries resulting from a violation of such a standard.[14]

In the late 1970s, increasing energy costs and the pronounced federal policy of energy conservation[15] combined to increase greatly demand for insulation products. Responding to this higher demand, many new, inexperienced insulation manufacturers entered the market to take advantage of the potential for high profit.[16] The infusion of new, inexperienced manufacturers, the inadequacies of state and local product safety regulation,[17] and the failure of the Consumer Product Safety Commission to promulgate

---

8. *See* S.Rep.No.94 -251, 94th Cong., 2d Sess. 4 (1975), *reprinted in* [1976] U.S.Code Cong. & Ad.News 993, 996.

9. 15 U.S.C. § 2056 (1976 & Supp. IV 1980).

10. *Id.* § 2069 (1976 & Supp. IV 1980).

11. *Id.* § 2070 (1976 & Supp. IV 1980).

12. *Id.* § 2071 (1976 & Supp. IV 1980).

13. *Id.* § 2073 (1976 & Supp. IV 1980).

14. *Id.* § 2072 (1976 & Supp. IV 1980).

15. The Carter Administration manifested its policy of energy conservation through the granting of tax credits for homeowners who installed insulation. *See* H.R.Rep.No.95–1116, 95th Cong., 2d Sess. 2–3 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 1044, 1044–46.

16. *Id.* at 3, *reprinted in* [1978] U.S.Code Cong. & Ad.News 1044, 1046.

17. *See* Emergency Interim Consumer Product Safety Standard Act of 1978, Pub.L.No. 95–319, 92 Stat. 386 (1978) (Statement of findings and purpose).

a uniform safety standard coalesced to produce an insulation market that by 1978 contained an increasing number of products that did not conform to minimum safety standards [18] and in which consumers had difficulty distinguishing between reputable and disreputable manufacturers.

Noting the dangers confronting consumers, the damage to the insulation industry's reputation, and the normal gestation period for rules promulgated by the Consumer Product Safety Commission,[19] Congress enacted the interim cellulose insulation safety standard [20] that is at issue in the present action.

■ In light of the legislative history of and congressional debate on the Emergency Interim Consumer Product Safety Standard Act of 1978, this Court concludes that the CPSA reflects a dual purpose with regard to the insulation industry: (1) to protect consumers from unsafe insulation, and (2) to preserve the reputation of the industry.[21] Given this conclusion, the Court believes that in enacting section 2082, Congress demonstrated clearly its concern that action be taken to achieve the CPSA's dual objectives in this regard. Plaintiff's effort here to seek redress for the alleged injury to its reputation as a wholesaler of insulation is consistent with the goals of the CPSA and presents precisely one form of injury that Congress intended to alleviate by enacting section 2082. Furthermore, the Court believes that recognizing a cause of action under section 2072 for violations of section 2082 for intermediary consumers like plaintiff here promotes compliance with the CPSA by increasing the deterrent effect of the Act as a whole. The Court thus rejects defendants' contention that the CPSA does not extend to plaintiff.[22]

■ Additionally, in light of the legislative history of the CPSA, the Court con-

18. *Id.*

19. The report of the Interstate and Foreign Commerce Committee noted that the Consumer Product Safety Commission had first been petitioned to formulate a safety rule pertinent to insulation in October 1976 but had failed to vote in favor of the development of such a rule until February 1978. The report further noted that throughout the commission's existence no rule had ever been developed in less than one and one-half years. Congress concluded that "[t]he public clearly cannot wait so long for protection. Congressional action appears to be the only answer to the immediate need for a safety rule." H.R.Rep.No.95–1116, 95th Cong., 2d Sess. 3 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 1044, 1046.

20. Emergency Interim Consumer Product Safety Standard Act of 1978, Pub.L.No. 95–319, 92 Stat. 386 (1978), codified at 15 U.S.C. § 2082 (1976 & Supp. IV 1980).

21. In support of the Emergency Interim Consumer Product Safety Standard Act of 1978, Congressman Sharp stated:

It is very clear that because of the bad publicity about cellulose insulation, some of which was deserved because there have been examples of outrageous ripoffs and hazardous materials or faulty installation, that bad publicity, unfortunately, has been given a broad brush over lots of good manufacturers, installers, and a good product in many in-

stances, and we must help the consumer distinguish between what is likely to be dangerous to him, and distinguish between that and what will be of help and of benefit to the consumer in this bill. This standard will help the consumer to do that, and will help the reputable manufacturer and will help the consumer sort it out.

124 Cong.Rec. 13912 (1978) (remarks of Rep. Sharp).

Senator Ford, Chairman of the Consumer Affairs Subcommittee of the Committee on Commerce, stated:

I am concerned that the reputations of legitimate cellulose manufacturers, who produce a safe and efficient product, are being unfairly damaged by the small but growing number who are producing an unsafe product.

· · · ·

This legislation will protect both the legitimate manufacturer and the individual consumer from those who are producing and selling an unsafe consumer product.

124 Cong.Rec. 391 (1978) (remarks of Sen. Ford).

22. In support of their contention that the CPSA does not include plaintiff's claim within its coverage, defendants cite *Plaskolite, Inc. v. Baxt Industries, Inc.*, 486 F.Supp. 213 (N.D.Ga.1980). In *Plaskolite*, the court held that a competing manufacturer was not an "interested person" within the meaning of section 2073 and therefore could not obtain injunctive relief. The *Plaskolite* court assumed that the plaintiff filed suit to maintain its competitive position in the

cludes that defendants' second argument, that the CPSA's coverage is limited to physical injury and that the CPSA therefore does not provide a remedy for economic injury, is similarly without merit. As noted earlier, defendants argue that section 2052(a)(3)'s definition of "risk of injury" defines the scope of any "injury" for which recovery may be sought under section 2072. The Court disagrees. "Risk of injury" as used in section 2052(a)(3) is not coextensive with "injury" as used in section 2072 and does not control the meaning of that term. If the definitions were so related, a consumer purchasing defective insulation could not recover if the defect caused his home to burn to the ground unless someone—*e.g.*, his wife or children—was injured. Congress could not have intended actual physical injury to be a prerequisite to recovery under the CPSA.

The Court thus finds that plaintiff is a proper plaintiff under section 2072 of the CPSA and alleges an injury for which the CPSA provides a cause of action. Accordingly, the Court denies defendants' motion for partial summary judgment.

market. The court reasoned that although plaintiff's purpose was legitimate, it was "not an interest promoted by the Act [CPSA] in general and especially section 24 [2073] of the Act granting any 'interested person' the right to bring private enforcement actions." *Id.* at 217 (citation omitted). Accordingly, the court dismissed plaintiff's claim.

*Plaskolite* does not affect the Court's decision here. Initially the Court notes that the *Plaskolite* court expressly limited the scope of its decision, applying it only to section 2073 and refusing to speculate about to which other sections its analysis could be applied. Moreover, unlike the plaintiff in *Plaskolite*, plaintiff here does not allege competitive disadvantage resulting from a competing manufacturer's failure to comply with established safety standards. Plaintiff here alleges damage to its commercial reputation and a resultant loss of sales. Both the injury alleged and remedy sought provide a basis for distinguishing *Plaskolite*.

Defendants also cite *Riegel Textile Corp. v. Celanese Corp.*, 493 F.Supp. 511 (S.D.N.Y. 1980), aff'd 649 F.2d 894 (2d Cir. 1981), to support their argument that plaintiff is not a proper plaintiff. *Riegel* deals with the question of whether the Federal Hazardous Substances Act, 15 U.S.C. § 1261 *et seq.*, contains an implied private right of action. In *Riegel*, section 2072 was inapplicable because the Consumer Product Safety Commission had not promulgated any safety standard applicable to the defendants. Plaintiff in *Riegel* relied on section 2072 by analogy. The *Riegel* court, in dicta, relied on *Plaskolite* to reject plaintiff's analogy. 493 F.Supp. at 518. While affirming the District Court, the Second Circuit implicitly recognized a private right of action if a safety rule has been promulgated. 649 F.2d at 901. After a careful review of the legislative history of the CPSA and section 2082, this Court finds *Riegel*, like *Plaskolite*, to be inapposite.