Josue COLON, an Infant under the age of 14 years by his Mother and Natural Guardian, Iris MOLINA, and Iris Molina, Individually, Plaintiffs,

v.

BIC USA, INC., Defendant.

No. 00 Civ. 3666(SAS).

United States District Court,
S.D. New York.

Dec. 19, 2000.

Barry Levy, Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox, LLP, New York City, for Plaintiffs.

Anthony Tagliagambe, London Fischer, LLP, New York City, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs, Josue Colon, an infant under the age of fourteen (14) by his mother and natural guardian, Iris Molina, and Iris Molina, individually, bring a personal injury action against defendant, BIC USA, Inc. ("BIC"), based upon the common law tort theories of negligence, strict products liability and breach of warranty in connection with the design, manufacturing, testing, merchandising, and marketing of a BIC disposable butane lighter. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332 and venue is proper in this district. Defendant now moves to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that plaintiffs' claims are expressly or impliedly preempted by the Consumer Product Safety Act ("CPSA"), 15 U.S.C. §§ 2051–2084 (2000), and the regulations promulgated by the Consumer Product Safety Commission ("CPSC"). For the reasons set forth below, defendant's motion is denied.

## I. BACKGROUND

### A. Factual Background

On January 2, 1998, Josue, then six (6) years old, sustained burns after setting his

shirt on fire with a lighter manufactured by BIC.[1] *See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss ("Pl.Mem.") at 2. Josue suffered second and third degree burns to 52% of his body. *See id.* This incident occurred while Josue was staying with his aunt, Brunilda Rivera, in Worcester, Massachusetts. *See id.*

## B. Procedural History

Plaintiffs filed their Summons and Complaint on February 9, 2000 in the Supreme Court of New York, County of New York. Defendant removed the action on March 10, 2000, but the case was remanded sua sponte by Judge Lewis A. Kaplan on March 27, 2000. *See* Order to Remand, Ex. C to Defendant's Notice of Motion, at 1. An Amended Summons and Complaint was served on April 14, 2000, and an Amended Answer was served on May 1, 2000. *See* Pl. Mem. at 3. On May 15, 2000, BIC filed a Notice of Removal with the Clerk of the Supreme Court of New York, County of New York asserting diversity jurisdiction.[2] *See id.* at 4.

## II. DISCUSSION

### A. Legal Standard

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 (2d Cir.2000). "[T]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading

that a recovery is very remote and unlikely but that is not the test." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998) (quotation marks omitted); *see also Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir. 1998) ("The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (quotation marks omitted).

■ To properly decide a Rule 12(b)(6) motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the non-moving party's favor. *See Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir. 1999). The court may consider documents incorporated by reference in the pleadings, as well as documents, while not explicitly incorporated into the complaint, that are integral to plaintiffs' claims. *See Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000).

### B. Procedural Issues

Two procedural arguments are raised by plaintiffs: (1) BIC has waived the defense of federal preemption by failing to raise it in its Answer; and (2) BIC has improperly relied on factual materials extraneous to the pleadings.

### 1. Waiver of the Preemption Defense

■ "Preemption is a defense 'in the nature of avoidance which falls within the realm of [Federal] Rule of Civil Procedure 8(c).'" *Heller v. Delta Air Lines, Inc.,* No. 92 Civ.1937, 1993 WL 330093, at *1 (S.D.N.Y. Aug. 25, 1993) (quoting *In re Air Crash Disaster at Stapleton Int'l Airport,*

---

1. The lighter in question is alleged to be a BIC J–15 model. *See* Memorandum of Law in Support of BIC's Motion for Summary Judgment ("Def.Mem.") at 2. It is undisputed that the J–15 model is subject to the regulations promulgated by the CPSC.

2. Jurisdiction is not challenged by either party.

721 F.Supp. 1185, 1186 (D.Colo.1988)). Plaintiffs assert that BIC failed to make any "reference to an affirmative defense based upon preemption" in its original or Amended Answer and has therefore waived this defense. Pl. Mem. at 4.

 Affirmative defenses pled pursuant to Federal Rule of Civil Procedure 8(c) are subject to the general rules of pleading and therefore must only state a defense in short and plain terms. *See D.S. Am. (East), Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F.Supp. 786, 797 (E.D.N.Y.1995). The main reason for Rule 8(c) is to protect plaintiffs from any unfair surprise. *See United States v. Continental Illinois Nat'l Bank and Trust Co. of Chicago*, 889 F.2d 1248, 1255 (2d Cir.1989); *see also D.S. Am.*, 873 F.Supp. at 797 ("An affirmative defense must sufficiently apprise the opposing party of the nature of the defense, providing the opposing party with adequate notice of the relevant elements of the defense."). The twelfth affirmative defense in BIC's Amended Answer states that "the subject lighter involved in the incident on January 2, 1998 met and/or exceeded the applicable federal and industry standard." Amended Answer, Ex. C to Reply Affidavit of Anthony Tagliagambe in Further Support of Defendant's Motion to Dismiss, ¶ 24. While BIC did not specifically use the word "preemption" in its affirmative defense, the plaintiffs were placed on notice of a defense of federal preemption. Accordingly, BIC has not waived this defense.

### 2. BIC's Reliance on Extraneous Materials

Plaintiffs argue that BIC improperly relies on factual materials extraneous to the

pleadings. *See* Pl. Mem. at 6. Plaintiffs further assert that should the Court consider these materials, a decision on the motion should be deferred until plaintiffs have been given the opportunity to conduct discovery to the extent necessary to oppose the motion. *See id.* BIC argues that the issue of whether plaintiffs' claims are preempted by federal law is a legal issue not dependent on the facts of this particular case. *See* Defendant's Reply Memorandum of Law ("Reply Mem.") at 10.

 " 'When matters outside the pleadings are presented [with or] in response to a 12(b)(6) motion,' a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under [Federal Rule of Civil Procedure 56(c) ] and afford all parties the opportunity to present supporting material.' " *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir.2000) (quoting *Fonte v. Board of Managers of Cont'l Towers Condominium*, 848 F.2d 24, 25 (2d Cir.1988)). This conversion requirement is strictly enforced and a district court "errs [if] it considers affidavits and exhibits submitted by defendants, ... or relies on factual allegations contained in legal briefs or memoranda, ... in ruling on a 12(b)(6) motion to dismiss." *Id.* (quotation marks and citations omitted).

 BIC has submitted various affidavits and letters attesting to its compliance with the CPSA and the regulations promulgated by the CPSC, yet has not made a formal request to treat this motion as a motion for summary judgment.[3] Although

---

**3.** Although BIC's Notice of Motion indicates that the motion is being brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the memorandum of law in support of BIC's motion is titled "Memorandum of Law in Sup-

port of BIC's Motion for Summary Judgment". In BIC's reply memorandum, it states "[t]his Reply Memorandum of Law is respectfully submitted in reply to Plaintiffs' Memorandum of Law in opposition ... to

courts may convert a Rule 12(b)(6) motion into a motion for summary judgment without formal notice to the parties, it is inappropriate to do so when, as here, the plaintiffs have *not* submitted materials other than the pleadings nor have they had the opportunity to complete discovery. *See Cantor v. NYP Holdings, Inc.,* 51 F.Supp.2d 309, 310 (S.D.N.Y.1999). Accordingly, BIC's motion will be treated as a Rule 12(b)(6) motion and no materials will be considered unless they are incorporated by reference in the pleadings or are integral to plaintiffs' claims. *See Rothman,* 220 F.3d at 88–89.

## C. Preemption

### 1. General Concepts

 The Supremacy Clause of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Federal law displaces state law where: (1) Congress expressly preempts state law; (2) Congress has established a comprehensive regulatory scheme in the area effectively removing the entire field from the state realm; or (3) state law directly conflicts with federal law or interferes with the achievement of federal objectives. *See English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); *see also Lady v. Neal Glaser Marine, Inc.,* 228 F.3d 598, 601 (5th Cir.2000); *Bedford Affiliates v. Sills,* 156 F.3d 416, 426 (2d Cir.1998). However, there is a presumption against preemption. In order to "avoid 'unintended encroachment on the authority of the States, ... a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find preemption.'" *Rombom v. United Air Lines, Inc.,* 867 F.Supp. 214, 218 (S.D.N.Y.1994) (quoting *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)). The areas of health and safety have traditionally been within the police powers of the states. *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *see also Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) ("States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (quotation marks omitted). The presumption that a state's police powers are not to be federally preempted may be overcome only upon a showing that preemption was the "'clear and manifest purpose of Congress.'" *Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240 (1996) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); *see also Cipollone v. Liggett,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Von Hundertmark v. Boston Prof'l Hockey Ass'n, Inc.,* No. 93 Civ. 1369, 1996 WL 118538, at *5 (E.D.N.Y. March 7, 1996).

### 2. The History of the CPSA

In 1967, Congress "established the National Commission on Product Safety to examine methods of protecting consumers against unreasonable risks of injury from household products and to propose remedies for existing legal inadequacies." *Wahba v. H & N Prescription Ctr., Inc.,* 539 F.Supp. 352, 354 (E.D.N.Y.1982) (citation omitted). In response to a 1972 study disclosing that approximately 20 million

---

BIC's motion and in further support of BIC's motion for an Order pursuant to Rule 12(b)(6) *or in the alternative Rule 56(b)* ... dismissing plaintiff Josue Colon's Complaint...." Reply Mem. at 1 (emphasis added).

Americans were injured in their homes each year, Congress enacted the CPSA, which authorized the establishment of an independent agency, the CPSC, for the purpose of regulating product safety. *See Griswold Insulation Co. v. Lula Cotton Processing Co.*, 540 F.Supp. 1334, 1339 (M.D.Tenn.1982) (citations omitted).

The CPSA was the "fruit of years of work by the legislature and others who recognized that modern technology and merchandising methods posed increasing threats to the nation's consumers." *Wahba*, 539 F.Supp. at 354. Prior to 1972, Congress had passed various laws with the intention of eliminating and/or reducing dangers posed by certain types of consumer products. However, this piecemeal implementation of legislation "resulted in a patchwork pattern of laws which, in combination, extend[ed] to only a small portion of the multitude of products produced for consumers." *Id.* (quotation marks and citations omitted). As such, one of the CPSA's primary purposes has been the promulgation of uniform national safety standards for consumer products. *See* 15 U.S.C. § 2051(b)(3); *see also Moe v. MTD Products, Inc.*, 73 F.3d 179, 183 (8th Cir. 1995). The CPSA contains a comprehensive enforcement scheme providing for such measures as civil and criminal penalties, injunctive remedies and seizure. *See* 15 U.S.C. §§ 2069–2071, 2073. The CPSA also provides for private enforcement of consumer product safety standards through an action filed in a United States District Court, *see id.* § 2073, and a private right of action for injuries resulting from a violation of such a standard. *See id.* § 2072.

Under the CPSA, the CPSC is authorized to issue a safety standard "that requires disposable and novelty lighters . . . to meet specified requirements for child resistance." Safety Standard for Cigarette Lighters, 58 Fed.Reg. 37557 (July 12, 1993). These requirements are "intended to reduce the risk of injuries and deaths that occur from fires started by children under the age of 5 playing with cigarette lighters." *Id.* This standard is set forth in 16 C.F.R. § 1210.1 et seq.

### 3. Express Preemption

A claim may be expressly preempted by the language of a statute. *See Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608. Whether plaintiffs' claims are expressly preempted hinges on the interpretation of two clauses within the CPSA—the preemption provision and the saving clause. Because they appear to contradict each other, it is important to recite the language contained in both. The preemption provision states:

> [N]o State or political subdivision of a State shall have any authority either to establish or to continue in effect *any provision of a safety standard or regulation which prescribes any requirements* as to the performance, composition, contents, design, finish, construction, packaging, or labeling of such product which are designed to deal with the same risk of injury associated with such consumer product, unless such requirements are identical to the requirements of the federal standard.

15 U.S.C. § 2075(a) (emphasis added).[4]

The saving clause provides that:

> Compliance with the consumer product safety rules or other rules or orders

---

**4.** 15 U.S.C. § 2075(b) allows states to establish or to adhere to safety requirements currently in effect that are not identical to the federal standards if the state requirements

provide a higher degree of protection than the federal standard. However, under 15 U.S.C § 2075(c), the State or political subdivision must apply to the CPSC for an exemption.

under this chapter shall not relieve any person from liability at common law or under state statutory law to any other person.

15 U.S.C. § 2074(a).

BIC argues that the language of 15 U.S.C. § 2075(a) expressly preempts state common law. *See* Pl. Mem. at 11–13. BIC relies on *Cipollone* for the proposition that the word "requirements" in the preemption provision necessarily "emcompass[es] obligations that take the form of common-law rules."[5] *Cipollone*, 505 U.S. at 521–22, 112 S.Ct. 2608. BIC also relies on cases that have interpreted the CPSA's preemption provision. *See* Reply Mem. at 3–6. Plaintiffs, on the other hand, argue that the Supreme Court has recently held that an act containing both a preemption provision and a saving clause, such as the CPSA, cannot expressly preempt state tort claims. *See* Pl. Mem. at 15–16 (citing *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000)).

Although the Second Circuit has not addressed the question of whether Congress intended to include common law claims within the scope of the CPSA's express preemption provision, a few circuits have. In *Moe*, 73 F.3d at 182, the Eighth Circuit found that the "[CPSA] preempts not only positive enactments of state standards, but also common law tort actions that would have the effect of creating a state standard." In reaching this conclusion, the court asserted that "[i]t is well established that a '[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief.'" *Id.* (quoting *Cipollone*, 505 U.S. at 521, 112 S.Ct. 2608). The court further stated that the saving clause "should not

be interpreted to subvert the preemption provision and should be read to save those claims that are not expressly preempted." *Id.* at 183. Claims that are not expressly preempted are those that do not "create a different standard ... or impose additional requirements on the manufacturer." *Id.*

Other courts have followed the reasoning of *Moe*. In *Cortez v. MTD Products, Inc.*, 927 F.Supp. 386 (N.D.Ca.1996), the court found no basis to distinguish the preemption provision of the Public Health and Cigarette Smoking Act analyzed in *Cipollone*, and the preemption provision of the CPSA:

> Both advert to "requirements," and there is no apparent difference, for purposes of measuring preemptive reach, between a "requirement or prohibition ... based on State law," [language in the Public Health and Cigarette Smoking Act] on the one hand, and, on the other, a "standard or regulation" established by a State or one of its political subdivisions [language in the CPSA].

*Id.* at 390. Accordingly, the court held that Congress intended to expressly preempt those common law claims that prescribe requirements relating to performance, packaging or labeling that deal with the same risk of injury that is dealt with by the federal standard in effect. *See id.* at 391; *see also Carlson v. Bic Corp.*, 89 F.3d 832 (6th Cir.1996) (although the court did not reach the preemption issue because the lighter in question was manufactured prior to July 12, 1994, the court noted that "[plaintiffs] now acknowledge ... that the state law claims are no longer viable and that the success of their appeal depends upon their ability to establish a Consumer Product Safety Act violation");

---

**5.** In *Cipollone*, the Supreme Court analyzed the preemption provision of the Federal Cigarette Labeling and Advertising Act, enacted in 1965, and its successor, the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. §§ 1331–1340.

*Frazier v. Heckingers & MTD Products, Inc.,* 96 F.Supp.2d 486 (E.D.Pa.2000); *Ball v. BIC Corp.,* No.4:97–CV–02467, 2000 WL 33312192 (D.Mo. Feb. 8, 2000) (the court followed the reasoning in *Moe* and concluded that the CPSA preempted a common law tort claim for design defect); *Minersville v. BIC Corp.,* Nos. Civ. A. 95–4548 and 95–5538, 1999 WL 551897, at *2 (E.D. Pa. June 23, 1999) (accepting the analysis set forth in *Cortez* ).[6]

BIC's reliance on these cases is misplaced.[7] In both *Moe* and *Cortez* the courts relied principally on *Cipollone.* However, unlike the CPSA, the Public Health and Cigarette Safety Act does not contain a saving clause. In *Geier,* the Supreme Court addressed the dilemma that occurs when a court is faced with an express preemption provision and a saving clause in the same act.[8] Although the Court was considering the preemption provision and saving clause contained in the National Traffic and Motor Vehicle Safety Act of 1966,[9] its analysis is directly applicable here.

 *First,* in response to American Honda's suggestion that a majority of the Court had previously determined that a preemption provision using the word "requirements" may expressly preempt similar tort actions,[10] the Court stated that

---

6. *Moe, Cortez,* and *Frazier* all involved accidents caused by lawn mowers. While regulated by the CPSC, lawn mowers are subject to different regulations than disposable and novelty lighters.

7. The cases cited above, except for *Frazier,* were decided before the Supreme Court's decision in *Geier. Frazier* was decided one day after *Geier.* Consequently, none of these decisions mention or take into account the *Geier* decision in their analyses.

8. The factual and procedural history of *Geier* are important. In 1992, Alexis Geier was injured when her 1987 Honda Accord crashed into a tree. Although the car was equipped with shoulder and lap belts, which Geier had duly fastened, it lacked an airbag. Geier sued Honda in the District Court for the District of Columbia, alleging that Honda had negligently and defectively designed the Accord without an airbag. The district court dismissed the suit, holding that the National Traffic and Motor Vehicle Safety Act of 1966 preempted Geier's state common law tort claims. The D.C. Circuit affirmed the decision but rejected the district court's analysis in light of the Act's saving clause, which states that compliance with federal safety standards does "not exempt any person from any liability under common law." Instead, the D.C. Circuit found that petitioners' state law tort claims posed an obstacle to the accomplishment of the Act's objectives. Because of that, it found those claims to be preempted under ordinary conflict preemption principles. The Supreme Court granted

certiorari to resolve the differing opinions as to whether the National Traffic and Motor Vehicle Safety Act of 1966 preempts certain state common law tort claims. *See Geier,* 120 S.Ct. at 1917.

9. The National Traffic and Motor Vehicle Safety Act of 1966 was originally codified at 15 U.S.C. § 1381 et seq. In 1994, Congress recodified the Act without any substantive change. The preemption provision, now codified at 49 U.S.C. § 30103(b) states that a "State or a political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter." The saving clause states that "[c]ompliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law."

10. American Honda relied on language drawn from the Supreme Court's decision in *Medtronic. See Geier,* 120 S.Ct. at 1918. In *Medtronic,* the Court considered the term "requirement" in the Medical Devices Amendments, 21 U.S.C. § 360k(a), to the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. §§ 301 et seq., 360c et seq., 360k. In the plurality opinion the Court stated "[t]hese state requirements therefore escape preemption, *not* because the source of the duty is a judge-made common-law rule, but rather because their generality leaves them outside the

there was no need to determine the significance of the particular language used because of the presence of a saving clause. *See id.* at 1918. The Court went on to say that a "saving clause assumes that there are some significant number of common-law liability cases to save" and "reading an express preemption clause narrowly to *exclude* common-law tort actions gives actual meaning to the literal language of the saving clause...." *Id.* (emphasis added). *Second,* while a saving clause removes common law tort actions from the scope of an express preemption clause, it does not "bar the ordinary working of conflict preemption principles." *Id.* at 1919. Thus, while a saving clause ensures that an express preemption clause will not, by its own force, preempt common law tort actions, courts must still engage in a conflict preemption analysis. In short, the presence of a saving clause does not moot the preemption inquiry. *See id.* "The two provisions [preemption and saving], read together, reflect a neutral policy, not a specially favorable or unfavorable policy, towards the application of ordinary conflict preemption principles." *See id.* at 1920.

■ The analysis set forth in *Geier* makes clear that the presence of the saving clause in the CPSA eliminates a broad reading of the preemption provision to include common law claims.[11] *See Choate v. Champion Home Builders Co.,* 222 F.3d 788, 793 (10th Cir.2000) (relying on the language in *Geier* to hold that the saving clause contained in the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. §§ 5401–

5426, prohibited express preemption of plaintiffs' common law claims); *see also Neal Glaser,* 228 F.3d at 610–11 (relying on the language in *Geier* to hold that the saving clause contained in the Federal Boat Safety Act, 46 U.S.C. §§ 4301–4311, prohibited express preemption of plaintiff's common law claims). I turn now to the "ordinary conflict preemption principles" that still must be applied in this case. *See Geier,* 120 S.Ct. at 1919–20.

### 4. Implied Preemption

■ "Implied preemption exists when (1) state law regulates conduct in a field Congress intended the federal government to occupy exclusively [referred to as implied field preemption], or (2) when state law actually conflicts with federal law [referred to as implied conflict preemption]." *Choate,* 222 F.3d at 795; *see also English,* 496 U.S. at 79, 110 S.Ct. 2270. Implied conflict preemption takes two forms. It occurs when it is "'impossible for a private party to comply with both state and federal requirements, ... or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Association of Int'l Automobile Mfrs., Inc. v. Abrams,* 84 F.3d 602, 607 (2d Cir.1996) (quoting *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995)). BIC does not argue that Congress intended the federal government to occupy the field of manufacture and safety of consumer products exclusively, and the language and history of the CPSA do not support such an assertion. However, BIC does argue that plaintiffs' claims conflict

---

category of requirements that § 360k envisioned...." *Medtronic,* 518 U.S. at 502, 116 S.Ct. 2240 (emphasis added); *see also Cipollone,* 505 U.S. at 521–22, 112 S.Ct. 2608. However, neither the Medical Devices Amendments nor the Public Health and Cigarette Safety Act contain a saving clause.

11. It is also noteworthy that both the House and Senate versions of the CPSA evidence an intention to expressly preserve common law tort claims. *See* H.R. Conf. Rep. No. 92–1593 (Oct. 12, 1972), *reprinted in* 1972 U.S.C.C.A.N. 4596.

with the federal safety standard governing disposable and novelty lighters promulgated by the CPSC.

### a. Actual Conflict

The Complaint asserts common law tort claims of negligence, strict products liability and breach of warranty in connection with the design, manufacturing, testing, merchandising, and marketing of the disposable lighter in question.[12] In order to determine whether these claims actually conflict with the federal standard, it is necessary to examine the requirements imposed on manufacturers and importers by the federal standard set forth in 16 C.F.R. § 1210 et seq.

The introduction to that section provides:

> This part 1210, a consumer product safety standard, prescribes requirements for disposable and novelty lighters. These requirements are intended to make the lighters ... resistant to successful operation by children younger than 5 years of age. This standard applies to all disposable and novelty lighters ... that are manufactured or imported after July 12, 1994.

16 C.F.R. § 1210.1. The standard also includes "labeling, testing, recordkeeping, reporting, and stockpiling" requirements for manufacturers and importers of disposable and novelty lighters. Safety Standard for Cigarette Lighters, 58 Fed.Reg. at 37557.

### (i) Plaintiffs' Failure to Warn Claim

 In *Ball*, the plaintiff, a three (3) year old child who was injured after set-

ting his shirt on fire with a BIC lighter, alleged that BIC negligently designed and manufactured the lighter, and that BIC was strictly liable because the lighter was in a defective condition, was unreasonably dangerous, and did not provide adequate warnings of the dangerousness of the product. *See Ball*, No. 4: 97–CV–02567, at 1. With respect to plaintiff's failure to warn claim, the court found that the "CPSC regulations ... do not provide any standards regarding the warning required on disposable lighters." *Id.* The court concluded that "a successful tort action based on an inadequate warning would not create a different standard or impose additional requirements on the manufacturer." *Id.* at 5–6.

As the *Ball* court correctly recognized, none of the federal regulations address what warnings, if any, must be placed on the lighters. In fact, the CPSC specifically declined to "mandate the use of [safety messages]" because it determined that "most lighters (including most lighters involved in child play fires) already carry[ ] warning labels, [and] a label-only rule [would] have slight benefits, if any." Safety Standard for Cigarette Lighters, 58 Fed.Reg. at 37572. Accordingly, it would not be impossible for manufacturers or importers such as BIC to comply with both a state standard that may mandate the use of safety warnings, and the federal standard promulgated by the CPSC which does not.

### (ii) Plaintiffs' Claims of Design and Manufacturing Defects

With respect to the manufacture and design of the disposable and novelty lighters, 16 C.F.R. § 1210.3 states:

---

12. Defendant argues that all of these claims are preempted, either expressly or impliedly. Plaintiffs specifically address why their claims based on failure to warn and strict product liability based on design and manufacturing defects—including inadequate testing—are not impliedly preempted. *See* Pl. Mem. at 28–31. Plaintiffs do not specifically discuss their breach of warranty and negligent marketing claims. However, for the same reasons set forth below, these claims are not impliedly preempted.

(a) A lighter subject to this part 1210 shall be resistant to successful operation by at least 85 percent of the child test panel when tested in the manner prescribed by § 1210.4.

(b) The mechanism or system of a lighter subject to this part 1210 that makes the product resist successful operation by children must:

(1) reset itself automatically after each operation of the ignition mechanism of the lighter,

(2) not impair safe operation of the lighter when used in a normal and convenient manner,

(3) be effective for the reasonably expected life of the lighter, and

(4) not be easily overridden or deactivated.

Pursuant to 16 C.F.R. § 1210.14, "[b]efore any manufacturer or importer of lighters distributes lighters in commerce in the United States, surrogate lighters of each model shall be tested in accordance with § 1210.4...." Section 1210.4 requires that a manufacturer or importer gain approval of its product by testing six (6) surrogate lighters on a panel of 100 children.[13] If the surrogate lighters meet the 85% acceptance criterion, the manufacturer or importer shall report the results to the CPSC at least thirty (30) days before it distributes or imports lighters corresponding to the model tested. *See* 16 C.F.R. § 1210.17(b). Further, the manufacturer or importer must include a certificate of compliance with each distribution that it makes indicating that the lighters conform to the federal standard. *See* 16 C.F.R. § 1210.12(b). This certificate must be based on a test of each item, or on a reasonable testing program. Section 1210.13 sets forth the minimum require-

ments of what the CPSC considers a reasonable testing program. In describing the general purpose of this certification process, the CPSC states:

> The purpose of this subpart B of part 1210 is to establish requirements that manufacturers, importers, and private labelers must follow to certify that their products comply with the Safety Standard for Cigarette Lighters. This subpart B describes the *minimum features of a reasonable testing program and includes requirements for labeling, recordkeeping, and reporting* pursuant to sections 14, 16(b), 17(g), and 27(e) of the CPSA, 15 U.S.C. §§ 2063, 2065(b), 2066(g), and 2076(e).

16 C.F.R. § 1210.11 (emphasis added).

If the requirements for the design and/or manufacture of a disposable lighter set by state common law provide a higher degree of protection than the federal standard set forth above, it would not necessarily mean a conflict exists, although it may mean that in order for manufacturers to protect themselves from liability they may have to design, test and manufacture disposable lighters in compliance with the higher standard established by the courts. Nonetheless, it would not be impossible for BIC to comply with both the state law and the federal regulations.

Therefore, to ascertain if a true conflict exists it is necessary to determine whether the enforcement of plaintiffs' claims would stand as "an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *See Abrams*, 84 F.3d at 607 (quotation marks omitted).

**b. Enforcing Plaintiffs' Claims Does Not Obstruct Congressional Objectives**

The CPSC regulations establish general, rudimentary and minimal require-

---

**13.** The children are to range in age from approximately forty-two (42) months to fifty- one (51) months old. *See* 16 C.F.R. § 1210.4(a)(4).

ments—that the child resistant mechanisms on the lighters "reset . . . automatically", "not impair safe operation . . . when used in a normal and convenient manner", "be reasonably effective for the expected life of the lighter", and "not be easily overridden or deactivated". 16 C.F.R. § 1210.3(b). The regulations do not specify design alternatives or production methods from which manufacturers may choose,[14] nor do they address what colors can and cannot be used in connection with the manufacture and distribution of these lighters.[15]

The regulations also require that 85% of the children used in the qualification testing prescribed by 16 C.F.R. § 1210.4 be unable to operate the lighter. In settling on this figure, the CPSC found that this pass rate "imposes the *least burdensome* requirement which prevents or adequately reduces the risk of injury for which the rule is being promulgated." 16 C.F.R. § 1210.5(g) (emphasis added). The CPSC further noted that this percentage "strikes a reasonable balance between improved safety for a substantial majority of young children and other potential fire victims and the potential adverse competitive effects and manufacturing disruption." 16 C.F.R. § 1210.5(g)(4).

A manufacturer or importer must issue a certificate of compliance indicating that the lighters meet the federal standard. This certificate must be based on a reasonable testing program. However, the regulations merely state that "[m]anufacturers and importers shall determine the types and frequency of testing for their own reasonable testing programs" and the "testing program should be sufficiently stringent that it will detect any variations in production or performance during the production interval that would cause any lighters to fail to meet the requirements of the standard." 16 C.F.R. § 1210.13.

In establishing the federal standard the CPSC expressed its desire to reduce by the least burdensome means the substantial number of injuries caused by children playing with disposable lighters. Viewed in this light, it is difficult to construe these regulations as anything but a mandatory minimum standard with which all manufacturers or importers must comply.[16] By no means, however, should compliance with this minimum standard automatically relieve a manufacturer or importer of state common law liability.[17] *See Geier*, 120 S.Ct. at 1919 (a saving clause preserves those actions that "seek to establish greater than the minimum safety achieved by

---

**14.** In *Geier*, the petitioner asserted that American Honda should have used airbags instead of the other safety mechanisms authorized by the federal standard. *See Geier*, 120 S.Ct. at 1925. The Court found implied preemption with respect to this claim because eliminating these options "would have presented an obstacle to the variety and mix of devices that the federal regulation sought." *Id.* In contrast, enforcing plaintiffs' common law causes of action in this case will not eliminate any choices offered by the federal regulations because no choices are provided.

**15.** Plaintiffs' design defect claim will rest, in part, on the color of the BIC lighter which they allege made the product unreasonably attractive to children. *See* Pl. Mem. at 28.

**16.** It is also important to note that Josue was six (6) years old at the time of the incident. Although the standard "is designed to reduce the risk of death and injury from accidental fires started by children playing with lighters", the CPSC expressly acknowledges that "[f]ires started by young children (*under age 5*) are those which the standard would be most effective at reducing." 16 C.F.R. § 1210.5(a) (emphasis added).

**17.** Nonetheless, compliance with the federal statute and/or regulations may constitute evidence that BIC exercised due care. *See Hamilton v. Accu–Tek*, 935 F.Supp. 1307, 1321 (E.D.N.Y.1996).

federal regulation intended to provide a floor").

Moreover, allowing plaintiffs' claims to go forward is consistent with the stated purposes of the CPSA. The four (4) stated purposes of the CPSA are:

(1) [T]o protect the public against unreasonable risks of injury associated with consumer products; (2)[T]o assist consumers in evaluating the comparative safety of consumer products; (3)[T]o develop uniform safety standards for consumer products and to minimize conflicting State and local regulations; and (4)[T]o promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries.

15 U.S.C. § 2051(b)(1)-(4); *see also Leipart v. Guardian Indus., Inc.,* 234 F.3d 1063, 1070 (9th Cir.2000) ("[W]e are not persuaded that state common law tort actions conflict with the overarching goal of the CPSA to create a system in which federal standards and state common law requirements both have roles to play."). A national minimum standard for the design, manufacture, and testing of disposable lighters, coupled with the added protection of state common law liability can only further protect the public, especially young children, against unreasonable risks of injury. In addition, the threat of liability under state common law will give manufacturers such as BIC further incentives to research and develop safer products. *See Bravman v. Baxter Healthcare Corp.,* 842 F.Supp. 747, 761 (S.D.N.Y.1994) ("It must be recognized that state tort actions, although clearly imperfect, remain a powerful incentive for improving product safety."). Finally, allowing plaintiffs' common law claims to proceed will have no impact on the preemptive effect of the federal standard on regulations or standards promulgated by state and local legislative or administrative bodies. Therefore, the federal standard will still serve to minimize any conflict with State and local regulations.

## III. CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is denied. A conference is scheduled for January 8, 2001 at 2:30 p.m.