**BIC PEN CORPORATION, Appellant,**

v.

**Janace M. CARTER, Individually and as Next Friend of Brittany Carter, Jonas Carter and Tarasha Gipson, Appellee.**

No. 13–03–560–CV.

Court of Appeals of Texas,
Corpus Christi–Edinburg.

Aug. 18, 2005.

---

Bert L. Huebner, Bay City, Reagan Wm. Simpson, King & Spalding, Houston, Darrell L. Barger, Hartline, Dacus, Barger, Dreyer, Corpus Christi, Kyle H. Dreyer, Hartline, Dacus, Barger, Dreyer & Kern, L.L.P., Dallas, for Appellant.

Lisa Powell, Daniel G. Gurwitz, Daniel Keith Worthington, Atlas & Hall, McAllen, for Appellee.

Before Justices HINOJOSA, YAñez, and GARZA.

## OPINION

Opinion by Justice GARZA.

This is a products liability case. Six-year-old Brittany Carter sustained third-degree burns to over 55 percent of her body when her five-year-old brother Jonas accidently set fire to her dress using a model J–26 lighter made by Bic Pen Corporation. Brittany's mother, Janace Carter, sued Bic as next friend of Brittany, claiming Brittany's injuries were caused by manufacturing and design defects in the lighter. The jury found for the plaintiff. It found three million dollars in actual damages, and after finding that Bic acted with malice, it found an additional two million dollars in exemplary damages.[1]

Bic now appeals the following issues: (1) the plaintiff did not present legally or factually sufficient evidence of causation; (2) the plaintiff's claims are preempted by federal consumer product safety law; (3) the plaintiff did not present legally or factually sufficient evidence of a design defect; (4) the plaintiff did not present legally or factually sufficient evidence of a manufacturing defect; (5) the trial court erred in giving its spoliation instruction and failing to instruct the jury that the presumption could be rebutted; (6) the trial court erred in admitting testimony of unqualified expert witnesses, who opined on irrelevant and prejudicial matters; (7) the plaintiff did not present legally or factually sufficient evidence to prove malice; and (8) the trial court awarded excessive interest.[2]

We hold that (1) the plaintiff's design-defect claim is not preempted by federal law, (2) the evidence is legally and factually sufficient to prove that a design defect in Bic's model J–26 lighter caused Brittany Carter's injuries and that Bic acted with malice, (3) the trial court did not commit reversible error by admitting testimony by the plaintiff's expert witnesses, and (4) the trial court did not award excessive interest. Accordingly, we affirm the judgment of the trial court based on the plaintiff's design-defect claim and do not address any of Bic's issues as they relate to the plaintiff's manufacturing-defect claim. See TEX. R.APP. P. 47.1.[3]

1. The award of exemplary damages was later reduced to $750,000 in compliance with chapter 41 of the civil practice and remedies code. See TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon Supp.2004–05).

2. This statement of the issues is taken directly from Bic's table of issues presented. As discussed in note 14, infra, Bic's factual-sufficiency challenges are actually argued together in a single issue rather than separately. This

Court will nevertheless address them as presented in Bic's table of issues.

3. Specifically, this Court does not decide and expresses no opinion on Bic's fourth and fifth issues, which relate solely to the plaintiff's manufacturing-defect claim. In addition, this Court's disposition of Bic's first, second, sixth, and seventh issues is strictly limited to those issues as they relate to the plaintiff's design-defect claim. We express no opinion

## I. Federal Preemption

■ At the outset, we must determine whether the plaintiff's design-defect claim is preempted, as Bic argues, by conflicting federal standards. Preemption is a legal issue, which this Court reviews de novo. *See City of Euless v. Dallas/Fort Worth Int'l Airport Bd.*, 936 S.W.2d 699, 702 (Tex.App.-Dallas 1996, writ denied) (citing *In re Humphreys*, 880 S.W.2d 402, 404 (Tex.1994)).

Pursuant to the Consumer Product Safety Act ("the Act"), the Consumer Product Safety Commission has issued standards regulating the child resistance of disposable lighters. *See* 15 U.S.C. §§ 2051–85 (2002). The federal government's objective in promulgating the standards is "to eliminate or reduce" the "unreasonable risk of death and injury [that disposable lighters pose] to consumers." 16 C.F.R. § 1210.5(e) (1993). The standards are set forth in 16 C.F.R. § 1210.1–.5 (1993) and are outlined, in relevant part, in the footnote below.[4] Generally speaking, the standards mandate that at least 85 percent of children under age five must be unable to operate disposable lighters.

The parties agree that the plaintiff's claim is not expressly preempted by federal law. *See* 15 U.S.C. § 2074(a) ("Compli-ance with consumer product safety rules ... shall not relieve any person from liability at common law."). Nevertheless, the plaintiff's claim could be implicitly preempted by federal law, as Bic argues. The United States Supreme Court has "recognized that a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (citations omitted). The Supreme Court has also "found implied conflict preemption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations omitted).

■ The only issue raised on appeal is whether the plaintiff's claim is preempted because it imposes standards that would stand as "an obstacle to the accomplishment and execution of the full purposes and objectives" of the federal government. *See id.* Specifically, Bic contends that the plaintiff's claim is an "obstacle to the accomplishment and execution ... of federal

on those issues to the extent they involve the plaintiff's manufacturing-defect claim.

4. Rather than dictating how lighters are to be designed or what safety features they must include, the Commission has adopted regulations detailing a protocol for testing disposable lighters. 16 C.F.R. § 1210.1. The regulations are intended to make lighters resistant to successful operation by children younger than five years of age. *Id.* The protocol requires testing of 100 randomly selected children between the ages of 42 and 51 months. *See id.* § 1210.4. The children are given two five-minute opportunities to operate "surrogate lighters," which have the same appearance and design as the actual lighter but emit a signal, such as a light or noise, rather than

a flame. *See id.* Each child's first attempt is undertaken without guidance from the tester. *See id.* If a child's first five-minute attempt is unsuccessful, the tester demonstrates how to use the lighter and the child is given an additional five minutes to operate the lighter. *See id.* § 1210.4(f)(4). A lighter passes the protocol if at least 90 percent of the 100 children cannot operate the lighter after two-five minute attempts. *See id.* § 1210.4(h)(1). If more than ten percent of the children operate the lighter, a different group of 100 children is empaneled to test the lighter. *See id.* The lighter passes the protocol if at least 85 percent of the 200 children cannot operate it. *See id.* § 1210.3(a).

objectives" because it imposes standards (1) raising the minimum percentage of children who cannot operate the lighters and (2) increasing the age (by two months) for children to be tested with the lighters. *See id.* The net effect of this rule, according to Bic, is to make child-resistant lighters too difficult for adults to operate, causing adults to switch to matches, a trend which would expose children to greater risk. We disagree.

As discussed in greater detail in Part II, *infra,* the plaintiff's claim takes issue with the wide variance in the J–26's child resistance, not with the federal standard regarding the minimum percentage of children who cannot operate the lighters. The plaintiff's claim is based on the availability of safer alternative designs that actually met the federal standard, were certified by the Commission, and put into mass production by Bic. According to the plaintiff, the wide variance in child resistance of J–26 lighters rendered the J–26 design unreasonably dangerous, especially given the availability of safer alternative designs that did not exhibit such wide variances. The evidence adduced at trial shows that the wide variance could be eliminated even without raising the minimum percentage of children who could not operate the lighter. In particular, the re-designed J–26 had the same number of children operate it as the old J–26, but it did not exhibit the same wide variance in child resistance.

Having reviewed the evidence documented in Part II, *infra,* as well as the arguments advanced by Bic, we are unable to conclude that the plaintiff's claim stands as an obstacle to the federal objective "to eliminate or reduce" the "unreasonable risk of death and injury [that disposable lighters pose] to consumers." 16 C.F.R. § 1210.5(e). Any rule of law created by the plaintiff's claim would further the federal objective by prohibiting lighter designs that allow for unreasonably wide variances in child resistance. In this sense, the plaintiff's claim complements and reinforces existing federal standards.

We also disagree that the plaintiff's claim would increase the age of children used to test lighters. Throughout this litigation, it has been Bic, not the plaintiff, that has invoked the age issue. After the plaintiff demonstrated that the actual child resistance of J–26 lighters could be much lower than 90 percent, Bic argued that the difference in age between the child testers and the child in this case rendered the test results "no evidence" of a design defect. The tests results were irrelevant, according to Bic, because only children under the age of five are covered by the federal standards and the child in this case was five years and two months old. The plaintiff, in turn, countered with evidence that the test results were relevant because the child in this case had developmental delays and functioned below the age of five. The plaintiff's claim does not assert that the J–26 was defectively designed because Bic failed to use children over the age of five in its tests. The age issue arose as a defensive theory, not as a defect theory. As such, the plaintiff's claim would not create a rule of law raising the age of children used to test lighters.

In sum, we conclude that the plaintiff's design-defect claim is not an obstacle to the accomplishment and execution of any federal objectives regarding disposable lighters. Any rule of law created by the claim would be in harmony with existing federal standards and further the federal objectives, even if its net effect would be to make lighters safer for children. *Accord Colon v. BIC USA, Inc.,* 136 F.Supp.2d 196, 208 (S.D.N.Y.2000) ("[I]t is difficult to construe these [federal] regulations as anything but a mandatory minimum standard with which all manufactur-

ers or importers [of disposable lighters] must comply. By no means, however, should compliance with this minimum standard automatically relieve a manufacturer or importer of state common law liability."). Bic's second issue is therefore overruled.

## II. Sufficiency of the Evidence

Bic's first, third, fourth, and seventh issues challenge the legal and factual sufficiency of the evidence supporting the jury's findings.[5] Because legal and factual sufficiency challenges are different evidentiary challenges, invoking different standards of review, we evaluate them separately.[6] We first address the legal and factual sufficiency of the evidence to prove that the J–26 was defectively designed and then address whether the evidence was legally and factually sufficient to prove causation and malice.[7]

**5.** As stated above, we do not address any of Bic's issues as they relate to the plaintiff's manufacturing-defect claim. Accordingly, we do not decide and express no opinion on Bic's fourth issue, which challenges the legal and factual sufficiency of the evidence to prove a manufacturing defect.

**6.** In conducting a legal sufficiency review, "all of the record evidence must be considered in a light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in that party's favor." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998); *see also Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001). If more than a scintilla of evidence supports the challenged finding, the no-evidence challenge must fail. *Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex.2003); *see also Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex.1999). More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995).

## A. Design Defect

In *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788–89 (Tex.1967), the Texas Supreme Court adopted section 402A of the Restatement (Second) of Torts on the scope of strict products liability. RESTATEMENT (SECOND) OF TORTS § 402A (1965). Section 402A provides that

(1) one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

In conducting a factual sufficiency review, we view all the evidence in a neutral light to determine whether the contested finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex.2003).

**7.** The statement of facts in Bic's appellate brief discusses some confusion as to whether the lighter involved in the fire ("the Subject Lighter") was actually a J–26 lighter. Bic's statement of facts refers to evidence that other lighters were recovered from the scene; however, Bic raises no issue as to the legal and factual sufficiency of the evidence to prove that the Subject Lighter was a J–26. Accordingly, we do not address the legal or factual sufficiency of the evidence to prove that the Subject Lighter was a J–26. Nevertheless, we find it worthwhile to note that the jury was asked only whether "the Subject Lighter" had a defect that caused Brittany's injuries. The jury charge defined "the Subject Lighter" as "the white Bic lighter marked as Plaintiff's Exhibits 1 and 1A," which the undisputed testimony established to be a J–26 model lighter produced by Bic.

*Id.* A product may be unreasonably dangerous because of a defect in its marketing, design, or manufacture. *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 426 (Tex. 1997) (citing *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 382 (Tex.1995); *Technical Chem. Co. v. Jacobs,* 480 S.W.2d 602, 604–05 (Tex.1972)). A product supplier is strictly liable for any such defects. *Id.;* RESTATEMENT (THIRD) OF TORTS §§ 1, 2 (1998); RESTATEMENT (SECOND) OF TORTS § 402A (1965).

The jury found that the J–26 was defectively designed and that the particular J–26 involved in the accident ("the Subject Lighter") was defectively manufactured. Because the plaintiff needed to prevail on only one defect claim to recover, we must affirm the award of actual damages if the evidence is legally and factually sufficient to prove either a design or manufacturing defect. *See Grinnell,* 951 S.W.2d at 426 (stating that defects in marketing, design, or manufacture can render a product unreasonably dangerous).[8] For the reasons given below, we conclude that there is both legally and factually sufficient evidence to support the jury's finding of a design defect. We therefore do not review the evidence supporting the jury's finding of a manufacturing defect or any issues related to that finding. *See* TEX.R.APP. P. 47.1.

■ A design defect exists only if a "safer alternative design" was available. TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a) (Vernon 1997). A design-defect claimant must also prove that the product was defectively designed so as to be unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use. *Hernandez v. Tokai Corp.,* 2 S.W.3d 251, 257 (Tex.1999); *see also* RESTATEMENT (THIRD) OF TORTS § 2 (1998) ("A

product ... is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design ..., and the omission of the alternative design renders the product not reasonably safe."). The risk-utility analysis involves consideration of several factors including the following:

(1) the utility of the product to the user and to the public as a whole weighed against the gravity and the likelihood of injury from its use;

(2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive;

(3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs;

(4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and

(5) the expectations of the ordinary consumer.

*Tokai Corp.,* 2 S.W.3d at 257 (citing *Grinnell,* 951 S.W.2d at 432). The determination of whether a product is unreasonably dangerous because of a design defect is often one that involves factual disputes that a party is entitled to have a jury resolve. *Id.* at 260. The issue is one of law only if reasonable minds cannot differ on the risk-utility analysis considerations. *Id.* at 261.

#### 1. Unreasonably Dangerous Product

*Legal Sufficiency*

■ Bic argues that the evidence is insufficient to prove a design defect because

---

**8.** The third question of the jury charge authorized the jury to award actual damages if Brittany Carter's injuries were caused by either a manufacturing or a design defect in the Subject Lighter.

the Commission has certified the J–26's compliance with federal regulations regarding child-safety. *See* 15 U.S.C. §§ 2051–85; 16 C.F.R. § 1210.1–.5. According to Bic, compliance with these regulations created a presumption of no design defect that was never rebutted by the plaintiff.[9] We disagree.

As noted above, the Act expressly states that compliance will not relieve a party from liability at common law. 15 U.S.C. § 2074(a). Thus, even a lighter meeting the federal standards can be the subject of common law claims for products liability against the manufacturer. *See id.; Colon,* 136 F.Supp.2d at 208 ("[I]t is difficult to construe these [federal] regulations as anything but a mandatory minimum standard with which all manufacturers or importers [of disposable lighters] must comply. By no means, however, should compliance with this minimum standard automatically relieve a manufacturer or importer of state common law liability."). Nevertheless, Texas statutory law is somewhat deferential to the standards created by federal authorities. Section 82.008(a) of the civil practice and remedies code creates a "rebuttable presumption" that no design defect exists when a manufacturer's design complies "with mandatory safety standards or regulations adopted and promulgated by the federal government...." TEX. CIV. PRAC. & REM.CODE ANN. § 82.008(a) (Vernon 2005). Bic acknowledges that this provision is relatively recent and does not apply to the plaintiff's claim, which was filed before the revisions became effective on September 1, 2003, *see* Acts 2003, 78th Leg., ch. 204, § 5.02; however, Bic maintains that common-law precedent creates a similar "rebuttable presumption."

Although we agree that compliance with the federal regulations is some evidence that no design defect exists, we conclude that, in this case, the plaintiff's evidence rebutted any no-defect presumption and is both legally and factually sufficient to prove a design defect in the J–26. At trial, the plaintiff relied heavily on Bic's internal documents. In particular, the plaintiff used Bic's design specifications for the J–26 and results from Bic's child-resistance testing of the J–26, which Bic supplied to the Commission pursuant to federal regulations. *See* 16 C.F.R. § 1210.1. The design specifications and test results demonstrate a wide variance in the J–26's child resistance. The variance proved that the J–26 was unreasonably dangerous because it could perform virtually as poorly as non-child-resistant lighters.

Bic contends that the test results are no evidence of a design defect because Jonas Carter, the child who started the fire, was over the age of five and, thus, not within the scope of any governing design standard for child-resistance testing. Jonas was five years and two months old at the time of the fire and technically fell outside the class of children for whom the Commission's child-safety protocol was designed. *See id.* (stating that the Commission's testing protocol is intended to make lighters resistant to successful operation by children younger than five years of age).

---

9. To support its argument regarding the no-defect presumption, Bic cites *GMC v. Harper,* 61 S.W.3d 118, 124 (Tex.App.-Eastland 2001, pet. denied) ("Compliance with NHTSA regulations provides a presumption of no design defect.") and *Sims v. Washex Mach. Corp.,* 932 S.W.2d 559, 565 (Tex.App.-Houston [1st Dist.]1995, no pet.) (relying on precedent from the Fifth Circuit Court of Appeals for the proposition that "[c]ompliance with government regulations is strong evidence, although not conclusive, that a machine was not defectively designed") (citing *Lorenz v. Celotex Corp.,* 896 F.2d 148, 150–51 (5th Cir.1990); *Ellis v. K–Lan Co.,* 695 F.2d 157, 161–62 n. 4 (5th Cir.1983)).

The significance of Jonas's age was contested before the jury. The plaintiff put on evidence that Jonas had problems with fine motor skills, suffered from attention deficit disorder, and was developmentally delayed by two and a half years. Based on this evidence, the jury could have reasonably found that, despite Jonas's age, the test results were useful in measuring the effectiveness of the J–26's child-safety features. Indeed, it is difficult to intuit any meaningful developmental difference between a child of Jonas's age and a child just under the age of five. No evidence was produced by Bic to establish any significant developmental acceleration during this age span. We have no basis for concluding, as Bic argues, that the cognitive and motor abilities of a child Jonas's age are so superior to a child just under the age of five that the test results lack evidentiary value. Given Jonas's mental and physical impairments and the marginal amount by which his age exceeded five years, this Court cannot conclude that the test results amounted to no evidence of a design defect.

To the contrary, for the reasons discussed in greater detail below, we hold that the design specifications and test results, in addition to other evidence and testimony, are legally sufficient to support the jury's finding of a design defect. The results indicate that the J–26 could be as little as 62.5 percent child resistant, even though the design specifications certified by the Commission state that the J–26 is 90 percent child resistant. We affirm the jury's design-defect finding based on this discrepancy.

Federal protocol requires manufacturers of disposable lighters to test six surrogate lighters representing the "range of forces" necessary for operation of the lighter. *See* 16 C.F.R. § 1210.4. As discussed in note 4, *supra*, the Commission does not dictate the design of lighters, nor does it designate the characteristics of child resistance. The Commission is solely concerned with the percentage of children who can operate the surrogate lighters and with ensuring that manufacturers produce lighters that actually fall within the range of forces represented by the surrogates.

Evidence was produced at trial regarding the five characteristics by which Bic measured the range of forces necessary to operate the J–26. These were (1) shield force, (2) shield movement, (3) sparkwheel rotation force, (4) fork force, and (5) fork movement. The characteristics work together to prevent child operation. At the top of a Bic disposable lighter is a shield (or guard) that must be depressed to operate the lighter. The first two characteristics were the force needed to depress the shield and the distance the shield must move. Once the shield is depressed, the user must rotate the sparkwheel. The force needed to move the sparkwheel was Bic's third characteristic. The last two characteristics related to the fork mechanism that releases butane gas to create a flame. The fork is moved by a certain force and must move a certain distance; thus, fork force and fork movement were the final two characteristics.

In the case of the J–26, the six surrogates produced by Bic for testing had at least slightly different values for each of the five characteristics outlined above. The plaintiff focused much attention on the variance among the surrogates in sparkwheel rotation force. According to documents produced by Bic and submitted to the Commission, operation of the J–26 required a sparkwheel rotation force between 2.3 and 3.7 pounds. The six surrogates tested by Bic represented most of this range, varying from 2.3 to 3.3 pounds of required force. Relying on the test results discussed below, the plaintiff ar-

gued that lighters produced at the lower end of this range were dangerously less child resistant than lighters produced at the upper end of the range.

The six J–26 surrogates were tested by a panel of 100 children, with each surrogate being tested by 16 to 17 children. The J–26 was certified as 90 percent child resistant because only 10 out of 100 children managed to operate the six surrogates, but the number of children operating the lighters was not evenly distributed among the surrogates. Only three of the six surrogates were operated: Surrogate Two was operated by 3 out of 17 children, Surrogate Four was operated by 1 out of 17 children, and Surrogate Five was operate by 6 out of 16 children. Nine of the ten children who operated a surrogate operated either Surrogate Two or Surrogate Five. Lighters built to these specifications would perform below the federal baseline of 85 percent: Surrogate Two would be 82.4 percent resistant, and Surrogate Five would be only 62.5 percent resistant. Surrogate Five, the worst performer of the group, also had the lowest sparkwheel rotation force: 2.3 pounds. Testing of the Subject Lighter after this lawsuit was filed revealed that its sparkwheel rotation force is equal to or less than 2.3 pounds.[10]

At trial, the plaintiff argued that Bic deliberately inserted lower-performing surrogates, such as Surrogate Five, into groups of lighters with better performances, such as the three surrogates which no child could operate during the testing of the J–26. According to the plaintiff, this allowed Bic to meet the Commission's protocol while still manufacturing lighters which were only marginally, if at all, safer than non-child-resistant lighters. Paul Adams, a Bic employee, testified that without any enhanced child-resistance features, a so-called "roll and press" model lighter, such as Bic's J–6, would be between 62 and 63 percent child resistant, virtually the same as Surrogate Five.[11] Thus, even though the J–26 was designed with enhanced child-safety features and was certified as "child resistant," it could perform virtually the same as a lighter with no such features or certification. As the plaintiff argued, the practical effect of this design was that children were left in as much danger with the "child-resistant" J–26 as they were with non-child-resistant lighters such as the J–6, which the Commission has concluded "pose an unreasonable risk of death and injury to consumers." 16 C.F.R. § 1210.5(e).[12]

Indulging, as we must, every reasonable inference deducible from the evidence in the plaintiff's favor, we conclude that the foregoing evidence rises to a level that would allow reasonable and fair-minded people to differ in their conclusions. *For-*

---

**10.** The plaintiff's evidence indicates that the Subject Lighter's sparkwheel rotation force is 2.12 pounds. At trial and on appeal, Bic maintains that the Subject Lighter's sparkwheel rotation force is 2.3 pounds. BRIEF OF APPELLANT, BIC PEN CORPORATION, p. 28.

**11.** The term "roll and press" describes the action necessary to operate the lighter: the user must rotate or "roll" the spark wheel and depress the thumb lever.

**12.** The Commission also offered the following evidence to support its standard:

The standard is designed to reduce the risk of death and injury from accidental fires started by children playing with lighters. From 1988 to 1990, an estimated 160 deaths per year resulted from such fires. About 150 of these deaths, plus nearly 1,100 injuries and nearly $70 million in property damage, resulted from fires started by children under the age of 5. Fire-related injuries include thermal burns—many of high severity—as well as anoxia and other, less serious injuries. The annual cost of such fires to the public is estimated at about $385 million (in 1990 dollars).

16 C.F.R. § 1210.5(a).

*mosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). A reasonable and fair-minded person could conclude that the design of the J–26 was defective and rendered the J–26 unreasonably dangerous because it allowed the lighter to be as little as 62.5 percent child resistant. We are mindful of the jury's role in weighing the risk-utility factors outlined by the supreme court and are reluctant to second-guess the jury's determination. *See Tokai Corp.,* 2 S.W.3d at 260–61 (risk-utility factors). A reasonable and fair-minded person could conclude that the J–26 was unreasonably dangerous because (1) the utility of the J–26 was outweighed by the gravity and likelihood of injury from its use; (2) a substitute product was available which would meet the same need as the J–26 and not be unsafe or unreasonably expensive; (3) Bic could have eliminated the wide-variance in the child resistance of the J–26 without seriously impairing its usefulness or significantly increasing its costs; and (4) ordinary consumers of "child-resistant" lighters, such as the J–26, expect such lighters to be more child resistant than lighters which are not certified, marketed, or sold as "child-resistant" lighters.[13]

For evidence to be legally sufficient, reasonable and fair-minded people must be able to differ in their conclusions. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995). Unanimity of conclusions is not required. *See id.* Having concluded that a reasonable and fair-minded person could find the J–26 to be unrea-

sonably dangerous, we overrule Bic's third issue as it relates to the legal sufficiency of the evidence to prove a design defect.

### Factual Sufficiency

We also overrule Bic's third issue as it relates to the factual sufficiency of the evidence to prove that the J–26 was unreasonably dangerous because of a design defect.[14] Bic's arguments on this point are largely the same as its arguments challenging the legal sufficiency of the evidence. For instance, Bic contends that certification by the Commission should preclude a finding of a design defect and that Jonas's age should render the evidence of a design defect insufficient. We have already considered these arguments, and even in a neutral light, we cannot conclude the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761–62 (Tex. 2003). In reaching our holding, we are especially mindful of section 82.008(b) of the civil practice and remedies code, which, though inapplicable in this case, recognizes that "mandatory federal standards or regulations ... [can be] inadequate to protect the public from unreasonable risks of injury or death." TEX. CIV. PRAC. & REM.CODE ANN. § 82.008(b).

### 2. Safer Alternative Design

 We now turn to the evidence relating to the availability of a safer alter-

13. The second and third considerations enumerated above deal with the availability and feasibility of a safer alternative design. The evidence supporting these considerations is discussed in detail in the following section titled "Safer Alternative Design," *infra,* Part II A 2. The fourth consideration is supported by user complaints that the J–26 was not actually child-resistant.

14. Although the table of issues presented in Bic's appellate brief lists its factual-sufficiency challenges as four separate issues, Bic actually argues its factual-sufficiency challenges together in a single issue. Because each factual-sufficiency challenge is a separate issue and must be given individual consideration, we address Bic's four issues separately.

native design, which Bic contends is legally and factually insufficient. In addition to proving that the J–26 was unreasonably dangerous, the plaintiff had to prove that (1) there was a safer alternative; (2) the safer alternative would have prevented or significantly reduced the risk of injury, without substantially impairing the product's utility; and (3) the safer alternative was both technologically and economically feasible when the Subject Lighter left Bic's control. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a)-(b); *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex.1999).

The Subject Lighter was made in October 1997. At trial, there was some dispute as to which design specifications and test results were applicable to the Subject Lighter. The plaintiff contended that specifications and test results produced in 1995 were controlling, but Bic countered with specifications and test results produced in 1997.[15] The 1995 and 1997 specifications and test results were different in the two years, owing, ostensibly, to a 1997 design change in the J–26. All of the documents were discussed before the jury and received as evidence. On appeal, Bic admits that "there is evidence that the 1995 specifications applied to the Subject Lighter." REPLY BRIEF OF APPELLANT, BIC PEN CORPORATION, p. 13, n. 6.[16] Because the parties agree that there is evidence to prove that the 1995 specifications and test results apply to the Subject Lighter and because there is no greater evidence to prove that the 1997 specifications and tests results apply, we have used the 1995 documents in our analysis of whether the evidence is sufficient to prove the J–26 was unreasonably dangerous. We also use them in the following analysis of whether a safer alternative design was available to Bic.

### Legal Sufficiency

The evidence adduced at trial established that several safer alternative designs were both technologically and economically feasible when the Subject Lighter left Bic's control. Each of the alternative designs was created and put into mass production by Bic. The first design, the J–25, was a "mini" version of the J–26. It was certified as 98 percent child resistant, meaning that only 2 out of 100 children could operate it. The second design, the J–16, was certified as 97 percent child resistant, meaning that only 3 out of 100 children could operate it. Neither of these designs produced a dangerously wide variance in child resistance, as did the J–26.

The third alternative was the redesigned J–26, which became available prior to the manufacture of the Subject Lighter. Bic changed the sparkwheel from a round wire to a square wire, and the shield was changed from one to two pieces. The redesigned J–26 also had different shield force, fork force, and sparkwheel rotation force. The redesigned J–26 was tested twice, once in March 1997 and once in May 1997. In the March test, 4 out of 100 children were able to operate its surrogates, with no more than two children operating the same surrogate. In the May test, 10 out of 100 children were able to

---

**15.** The 1995 test results were generated from tests actually conducted in October 1994. The test results were sent to the Commission in January 1995. For simplicity, the test results will be referred to as the 1995 test results, because that is when they were sent to the Commission and when the Commission certified the J–26.

**16.** At trial, the plaintiff produced evidence that, during depositions, Bic's representatives identified the 1995 specifications as being applicable to the Subject Lighter.

operate its surrogates, with no more than three children operating the same surrogate. The redesigned J–26 was thus less prone to wide variance in child resistance than its older counterpart, even though the same number of children operated their surrogates in the May test.

As discussed above, a wide variance in child resistance rendered the J–26 unreasonably dangerous. The performances of the J–25 and J–16 were vastly superior to that of the J–26 because those models had almost no variance among the surrogates. Even the redesigned J–26 performed more consistently than its older counterpart. Based on the foregoing evidence, a reasonable and fair minded person could conclude that, at the time the Subject Lighter left Bic's control, a safer alternative design was available to Bic that would have prevented or significantly reduced the risk of injury without substantially impairing the product's utility.[17] Accordingly, we overrule Bic's third issue as it relates to the legal sufficiency of the evidence to prove the availability of a safer alternative design.

### Factual Sufficiency

In arguing that the evidence is factually insufficient to prove a safer alternative design, Bic contends that some consumers complained of difficulty in operating the J–16, indicating that the product's utility was diminished by its greater child resistance. Although the J–16 may have been more difficult for adults to operate than the original J–26, Bic points to no such evidence regarding the J–25 or the redesigned J–26. Even if such evidence had been produced, it would not necessarily prove that the product's utility was "sub-

stantially" impaired, as required by statute. *See* Tex. Civ. Prac. & Rem.Code Ann. § 82.005(a)-(b). Even assuming *arguendo* that user complaints regarding the J–16 amounted to some evidence of substantial impairment, Bic has not established that the jury's finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *See Golden Eagle Archery*, 116 S.W.3d at 761–62. Bic's third issue is therefore overruled.

### B. Causation

Bic also contends that the evidence is legally and factually insufficient to prove that a design defect in the Subject Lighter caused Brittany Carter's injuries. Producing cause is the test for causation in strict liability cases. *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995). A producing cause is an efficient, exciting, or contributing cause, which in a natural sequence, produced the injuries or damages of which the claimant complains. *Id.* Proximate and producing cause differ in that foreseeability is an element of proximate cause but not of producing cause. *Id.* Common to both proximate and producing cause is causation-in-fact, including the requirement that the defendant's conduct or product be a substantial factor in bringing about the plaintiff's injuries. *Id.* There may be more than one producing cause. *Coleman v. Cintas Sales Corp.*, 40 S.W.3d 544, 550 (Tex.App.-San Antonio 2001, pet. denied).

It is not required that a witness conclusively state that a product caused the plaintiff's injury. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.

---

**17.** The undisputed evidence also shows that Bic actually manufactured and sold the J–25, J–16, and redesigned J–26. This proves, at least circumstantially, that those designs were economically feasible. In addition, there was direct evidence that the cost of manufacturing the J–16 was only $0.0012 greater per unit than the cost of manufacturing the J–26.

1983). The jury may determine causation based on circumstantial evidence. *Id.*[18] In *Kindred*, for instance, the Texas Supreme Court held that the jury could have determined a defective product caused a fire because it was made of "a very flammable mixture" and was being used when the fire occurred. *Id.* No direct testimony of causation was necessary. *See id.*

### Legal Sufficiency

■ The evidence adduced at trial shows that Jonas was playing with the Subject Lighter, a model J–26 lighter produced by Bic, when he accidently set fire to Brittany's dress. Guided by *Kindred*, we conclude that a reasonable finder of fact could infer from the circumstances of this case that the defective design of the J–26 was a producing cause of Brittany's injuries. The plaintiff proved that J–26 lighters could be just as ineffective at preventing child operation as lighters that were not certified or marketed as "child resistant." The plaintiff also produced evidence that the Subject Lighter performed at the lower-end of Bic's design specifications, indicating that it was much easier for a child to operate than other "child-resistant" lighters. The defective condition of the Subject Lighter enabled Jonas to operate it, and Jonas's operation of the Subject Lighter resulted in Brittany's injuries.

The plaintiff had no burden to prove that the defective design of the Subject Lighter was the only producing cause of Brittany's injuries. *See Coleman*, 40 S.W.3d at 550. The supreme court has specifically stated that a child burn victim is not precluded from recovering against the manufacturer of a defective lighter simply because he or she was burned as a result of another child's use of the lighter. *Tokai Corp.*, 2 S.W.3d at 257. Thus, Jonas's actions would not preclude a finding of causation.

The evidence discussed above rises to the level that would allow reasonable and fair-minded people to reach different conclusions. We therefore overrule Bic's challenge to the legal sufficiency of the evidence.

### Factual Sufficiency

We also overrule Bic's challenge to the factual sufficiency of the evidence. Bic argues that other circumstances of the fire render the evidence of causation insufficient. Bic points out that the children were unsupervised at the time of the fire and that their mother used disposable lighters to light her cigarettes. Bic also points out that it is unknown how long the children were alone prior to the fire. We will not overturn the jury's verdict based on these considerations.[19] They do not

---

**18.** The Texas Supreme Court has long held that causation may be proved by circumstantial evidence. *See Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex.1987) ("[C]ircumstantial evidence and inferences therefrom are a sufficient basis for a finding of causation."); *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 755 (Tex.1975) ("Proximate cause, like any other ultimate fact, may be established by circumstantial evidence."); *Lynch v. Ricketts*, 158 Tex. 487, 314 S.W.2d 273, 275–76 (1958) ("It is well settled ... that negligence and causation, like any other ultimate fact, may be established by circumstantial as well as direct evidence."); *Peveto v. Smith*, 134 Tex. 308,

133 S.W.2d 572, 576 (1939) (relying on circumstantial evidence to prove negligence and causation).

**19.** There was evidence that the children were being supervised by their sixteen-year-old sister, who was in a different room at the time of the fire. In its reply Brief, Bic concedes that the children's sister was in the apartment but nevertheless argues that the children were unsupervised because their sister was actually in a different room watching television. *See* REPLY BRIEF OF APPELLANT, BIC PEN CORPORATION p. 2, n. 1.

disprove that the Subject Lighter was a producing cause of Brittany's injuries, and they do not demonstrate that the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *See Golden Eagle Archery,* 116 S.W.3d at 761–62.

In its factual sufficiency argument, Bic does not contend that Jonas used a lighter other than the Subject Lighter to set fire to Brittany's dress, nor does Bic contend that the Subject Lighter was not a model J–26. Instead, Bic argues that the circumstances of the fire outweigh the plaintiff's evidence of causation. We have reviewed these circumstances and do not find that they greatly outweigh the evidence proving that the Subject Lighter was a producing cause of Brittany's injuries.

Accordingly, Bic's first issue is overruled.

### C. Malice

 Finally, we turn to the jury's finding that Bic acted with malice, which Bic contends is supported by legally and factually insufficient evidence.[20] Malice is defined as

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, eff. Sept. 2, 1987; amended by Acts 1995, 74th Leg., ch. 19, § 1, eff. Sept. 1, 1995.[21] In 1995, the legislature substituted malice for gross negligence as the prerequisite for punitive damages, but it also redefined malice, through the addition of subsection (B), to mirror the definition of gross negligence articulated by the Texas Supreme Court in *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex. 1994). *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 n. 2 (Tex.1998). Consequently, prior precedent regarding gross negligence is relevant to a finding of malice as redefined by the above provision. *See Ellender,* 968 S.W.2d at 921 n. 2.

### *Legal Sufficiency*

 When viewed objectively, Bic's production of the Subject Lighter involved

**20.** Because malice must be proved by clear and convincing evidence, an elevated standard of proof, we apply a more exacting sufficiency review on appeal by looking at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding of malice was true. *See In re J.F.C.,* 96 S.W.3d 256, 264–68 (Tex. 2002); *see also Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 609–10 (2004).

**21.** The current version of this provision is found in section 41.001 of the civil practice and remedies code. Tex. Civ. Prac. & Rem.Code Ann. § 41.001(7) (Vernon Supp.2003). Section 41.001 of the Texas Civil Practice and

Remedies Code was amended by Act of June 2, 2003, 78th Leg., ch. 204, § 13.02, 2003 Tex. Gen. Laws 847, 887, eff. Sept. 1, 2003, but section 23.02(d) of Acts 2003, 78th Leg., ch. 204 provides that "[a]n action filed before the effective date of this Act ... is governed by the law in effect immediately before the change in law made by this Act, and that law is continued in effect for that purpose." The instant action was filed prior to September 1, 2003 and is therefore governed by the version of section 41.001 that was in effect prior to September 1, 2003. All citations to section 41.001 in this opinion refer to the version in effect prior to September 1, 2003.

an extreme degree of risk. We have already documented evidence proving that the J–26 could be as ineffective at preventing child operation as lighters that were not certified, marketed, or sold as "child resistant." The federal government has officially recognized the "unreasonable danger" posed by such lighters and has promulgated standards to prevent them from reaching children.[22] On paper, Bic has complied with these standards, even with the J–26. The evidence documented above, however, indicates that Bic has nevertheless succeeded in selling "child resistant" lighters, including the Subject Lighter, that are capable of performing just as poorly as non-child-resistant lighters.

The jury found that the Subject Lighter was defectively designed. The evidence supporting the jury's finding demonstrates that the J–26 had a wide variance in child resistance and that the Subject Lighter performed at the low end of the variance, rendering it unreasonably dangerous. All the evidence documenting the variance came from Bic. The evidence therefore suffices to prove not only the variance but also Bic's actual, subjective awareness of the variance and the extreme degree of risk it created.

At trial, Bic produced evidence that lighters with a higher child resistance than the J–26 were disfavored by some consumers, who would not purchase such lighters. The jury could have listened to such evidence and concluded that Bic had a profit motive for producing lighters with the least child resistance allowable under the federal standards. The jury could have concluded that the wide variance in the J–26 child resistance was deliberate, that Bic deliberately inserted a low-performing surrogate into a group of otherwise acceptable lighters with the intention of producing all of its lighters at the low end of the specifications. The jury could have also concluded that this approach allowed Bic to effectively circumvent the federal standards.

This Court need not offer an opinion on the evidence, except to hold that a reasonable trier of fact could review such evidence and form a firm conviction or belief that Bic acted with malice because it produced and sold the Subject Lighter with conscious indifference to the extreme degree of risk it created. *See In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex.2002); *see also Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 609–10 (2004). Any rule of law created by this precedent would not force lighter manufacturers to sell "child proof" lighters, as Bic argues. The evidence before us indicates that no lighter can be absolutely "child proof." The same evidence, however, strongly indicates that Bic was capable of producing and did, in fact, produce much safer alternatives to the Subject Lighter. As discussed above, the jury's design-defect finding rests on Bic's actual production and sale of safer lighters that were certified by the Commission. Thus, no impossible standard is created by this decision.

■■■ In its challenge to the legal sufficiency of the evidence to prove malice, Bic also contends that exemplary damages are unconstitutional because its conduct was legal in Connecticut, the state where the Subject Lighter was manufactured. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (holding that states may not impose economic sanctions for violations of their laws with the intent of changing tortfeasors' lawful conduct in other states). No evidence or authority has been produced to establish that Bic's conduct was legal in any state. There is also no indication in

**22.** *See* notes 4 and 12, *supra.*

Bic's appellate brief that this contention was raised at trial or otherwise ruled on by the trial court. The plaintiff argues that Bic waived this issue by failing to raise it at trial, an argument which is ignored in Bic's reply brief. *See* TEX.R.APP. P. 33.1(a). Given the complete absence of argument, evidence, and authority to establish that Bic's conduct was legal in Connecticut, we overrule this issue without reviewing its merits or deciding whether it was preserved. *See* TEX.R.APP. P. 38.1(h) ("The brief must contain a clear and concise argument for the contention made, with appropriate citations to authorities and to the record.").

### Factual Sufficiency

In note 14, *supra*, we explained that Bic's factual-sufficiency challenges are presented together in a single issue in which Bic argues that the evidence is factually insufficient to prove a defect, causation, or malice. We have addressed this issue as three different issues because it implicates three different findings, any one of which may be independently challenged. The task has proven especially difficult with respect to the jury's finding of malice. Bic's single-issue approach does not discuss any evidence contradicting the jury's finding of malice. Instead, Bic points to evidence that arguably disproves the existence of a defect and causation. The evidence relied upon by Bic has been discussed above, in sections of this opinion dealing with design defect and causation. Although we understand that evidence contradicting the jury's finding of a defect or causation could also militate against a finding of malice, we have already held that the evidence in this case is factually sufficient to prove a defect and causation. To the extent that Bic's single issue implicates the factual sufficiency of the evidence to prove malice, it presents no additional evidence for this Court to review. Having viewed the record in a neutral light, we cannot identify any evidence that would necessarily prevent a reasonable fact finder from forming a firm conviction or belief that Bic acted with malice. Accordingly, we overrule Bic's challenges and hold that the evidence is legally and factually sufficient to support the jury's finding of malice.

### III. Expert Testimony

In its sixth issue, Bic argues that the trial court erred in admitting testimony of two expert witnesses, William Kitzes and Thomas Read. Bic argues that neither of these experts was qualified to give relevant testimony. Their testimony was prejudicial, according to Bic, because it was critical of Bic's production testing, corporate safety policies, and alleged violations of record-keeping requirements.

■■■■ The admission and exclusion of evidence is committed to the trial court's sound discretion. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). A party seeking to reverse a judgment based on evidentiary error need not prove that but for the error a different judgment would necessarily have been rendered; it must show only that the error probably resulted in an improper judgment. *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex.1992); *see also* TEX.R.APP. P. 44.1(a). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex.1995). We determine whether the judgment turns on the challenged evidence by reviewing the entire record. *Id.* at 754.

■■■ Most, if not all, of the testimony of which Bic complains relates to the plaintiff's manufacturing-defect claim rather

than its design-defect claim. In today's decision, we have expressed no opinion on the manufacturing-defect claim. Nevertheless, we have reviewed the entire record, even as it relates to that claim, and cannot conclude that the judgment turns on the challenged evidence. Even if the testimony were erroneously admitted, Bic has not established that the error had an effect on the judgment. This is especially true because the judgment would be the same even if the jury had found that no manufacturing defect existed. To secure the judgment, the plaintiff needed to prevail on only one defect claim.[23] We have documented the evidence supporting the plaintiff's design-defect claim and the jury's finding of malice and have in no way relied upon the evidence of which Bic now complains.

In concluding that the error, if any, did not probably result in an improper judgment, we find the following considerations significant. Neither witness offered direct testimony that the Subject Lighter was defectively designed or caused Brittany's injuries. Neither witness offered an opinion on whether Bic acted with malice. To the extent the witnesses testified regarding the plaintiff's design-defect claim, the testimony was mostly limited to explaining the child-safety features of the Subject Lighter, the testing protocol created by the Commission, and the results of such testing on the J–26, the redesigned J–26, the J–16, and the J–25. Similar testimony was given by Bic's witnesses. There was some testimony from William Kitzes regarding the Subject Lighter and how it compared to Surrogate Five and the J–26 design specifications, but Bic's counsel admitted on the record that such testimony did not require an expert because it was simply a matter of "pointing to documents." Reporter's Record, Volume 7, p. 63.

For these reasons, Bic's sixth issue is overruled.

## IV. Excessive Interest

In its eighth issue, Bic argues that the trial court awarded excessive interest because the provisions of House Bills 4 and 2415 govern the interest rate applicable to the judgment in this case.[24] We disagree.

House Bills 4 and 2415 amended section 304.003(c) of the finance code, reducing the effective post-judgment interest rate from ten to five percent.[25] The bills also changed the pre-judgment interest rate, which is equal to the post-judgment interest rate applicable at the time of the judgment. TEX. FIN.CODE ANN. § 304.103 (Vernon Supp.2004–05). The revisions of each bill apply to cases in which "a final judgment is signed or is subject to appeal on or after the effective date" of the act.[26] The provisions therefore apply if the judgment in this case was signed on or after the effective date of either act, or if the judgment became subject to appeal, that is,

---

**23.** *See* note 8, *supra.*

**24.** *See* Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 6.01 (House Bill 4); Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1 (House Bill 2415).

**25.** Although House Bills 4 and 2415 are different acts, they contain almost identical revisions to the post-judgment interest provisions of the finance code. In this regard, they differ only in that House Bill 4 contains a provision prohibiting pre-judgment interest on future damages. *Compare* Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 6.02 (House Bill 4) *with* Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1 (House Bill 2415).

**26.** *See* Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 6.04 (House Bill 4); Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2(a) (House Bill 2415).

capable of being appealed, on or after the effective date of the act. *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 255 (Tex.App.-Texarkana 2005, no pet.).[27] To determine the applicability of the bills, we must first determine (1) the date each bill became effective, (2) the date the judgment was signed, and (3) the date the judgment became appealable.

There is no dispute that House Bill 4 became effective on September 1, 2003. There is also no dispute that the judgment was signed and became appealable on August 8, 2003. *See, e.g., Tesfa v. Stewart*, 135 S.W.3d 272, 279 (Tex.App.-Fort Worth 2004, pet. denied) (holding that a final judgment can be appealed after it is signed by the judge). Because the judgment was not signed on or after the effective date of House Bill 4 and because it did not become subject to appeal on or after that date, House Bill 4 does not apply in this case. *See Penny*, 160 S.W.3d at 255.

We must next determine whether House Bill 2415 applies. The parties dispute when House Bill 2415 became effective. Bic argues that it took immediate effect upon signing by the governor on June 20, 2003. The plaintiff argues that it could not have taken immediate effect be-cause it was modified by Senate Concurrent Resolution 66, which was not passed by the two-thirds majority necessary for immediate action and because no record vote occurred. According to the plaintiff, House Bill 2415 took effect, if at all, on September 1, 2003.

Although most of our sister courts have stated, either directly or indirectly, that House Bill 2415 took effect on June 20, 2003, none of the courts has addressed the issue raised by this appeal.[28] When this Court previously held that House Bill 2415 took effect on June 20, 2003, we did so without considering any arguments re-garding irregularities in the passage of the bill. *See In re Kajima Int'l, Inc.*, 139 S.W.3d 107, 117 (Tex.App.-Corpus Christi 2004, pet. denied). We assumed it went into effect when the governor signed it because Resolution 66 was not brought to our attention. *Id.* ("[O]n June 20, 2003, the Governor signed HB 2415, giving it an effective date of June 20, 2003."). In this appeal, we decide the effective date of House Bill 2415 for the first time as a legal issue. In doing so, we note that the outcome of *In re Kajima Int'l* would not be different under the precedent created by

---

**27.** *See also City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 388–89 (Tex.App.-Dallas 2004, no pet.); *Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 865 (Tex. App.-Fort Worth 2003, pet. denied).

**28.** *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 254 (Tex.App.-Texarkana 2005, no pet.) ("House Bill 2415 or House Bill 4 (or both), effective June 20, 2003, and September 1, 2003, respectively...."); *Pringle v. Moon*, 158 S.W.3d 607, 610 n. 2 (Tex.App.-Fort Worth 2005, no pet.) ("We note that the five percent prejudgment interest rate actually went into effect on June 20, 2003 by virtue of House Bill 2415."); *Sibley v. RMA Partners., L.P.*, 138 S.W.3d 455, 460 n. 3 (Tex.App.-Beaumont, no pet.) (stating that House Bill 2415 was effective on June 20, 2003); *Columbia Med. Ctr. of Las Colinas v. Bush*, 122

S.W.3d 835, 866 (Tex.App.-Fort Worth 2003, pet. denied) (holding, implicitly, that House Bill 2415 was effective June 20, 2003); *see also Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, No. 03–03–00376–CV, 2005 WL 1787440, *38 n. 48, 2005 Tex.App. LEXIS 5949, *127 n. 48 (Austin, July 29, 2005, no pet. h.) (publication pending) (stating that the effective date of House Bill 2415 was June 20, 2003); *City of Houston v. Fletcher*, 166 S.W.3d 479, 494 (Eastland 2005, no pet. h.) (stating that the effective date of House Bill 2415 was June 20, 2005); *Bennett v. Cochran*, No. 14–00–01160–CV, 2004 WL 852298, *7, 2004 Tex.App. LEXIS 3545, *24 (Houston [14th Dist.] April 22, 2004, no pet.) (publication pending) ("The effective date of this act was June 20, 2003.").

today's decision. Our holding in *In re Kajima Int'l* did not turn on the difference between June 20, 2003 and September 1, 2003, as does this case. In fact, the final judgment in *In re Kajima Int'l* was signed on April 22, 2002, placing the case well outside the scope of either effective date. *Id.* at 144. The precedential value of *In re Kajima Int'l* is therefore unaffected by today's decision.

We now turn to the governing authority on this issue. In relevant part, the Texas Constitution provides

> No law passed by the Legislature, except the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless the Legislature shall, by a vote of two-thirds of all the members elected to each House, otherwise direct; said vote to be taken by yeas and nays, and entered upon the journals.

TEX. CONST. art. III, § 39. The Texas Supreme Court has stated that this provision also applies to amendments and reports of conference committees. *Caples v. Cole*, 129 Tex. 370, 102 S.W.2d 173, 176 (1937). Otherwise, a harmless bill might be passed in its inception by the requisite vote and then be radically amended and such amendments be put into immediate effect without the vote required by the Texas Constitution. *Id.*

On June 1, 2003, the legislature passed House Bill 2415 by more than a two-thirds majority vote of each house. The vote was taken by yeas and nays, and the results were duly recorded in the House and Senate Journals. On June 2, 2003, the legislature adopted Resolution 66, which amended House Bill 2415 by changing its cap on the post-judgment interest rate from the yield on United States Treasury Bills to the prime rate as published by the Federal Reserve Bank of New York. The House and Senate Journals indicate that the resolution "was adopted without objection," but there is no indication that the resolution passed by a recorded two-thirds majority vote taken by yeas and nays.[29]

Bic contends that Resolution 66 did not prevent House Bill 2415 from taking immediate effect because it merely corrected "technical errors" contained in House Bill 2415 and therefore did not trigger any requirement for a new recorded vote on the amended bill. Although Resolution 66 uses the expression "technical errors" to describe the subject of its changes to House Bill 2415, the amendment appears to affect a substantive provision of the bill. We cannot conclude that the changes are "radical," but at the same time, they cannot be brushed aside as purely "technical" simply because that is the language used in the resolution. It is beyond the purview of this Court to opine on the difference between the treasury yield and the prime rate and the effect a change from one to the other would likely have on the post-judgment interest rate. Given our limited knowledge in the matter, we apply the rule stated in *Caples*, which does not distinguish between "radical" or "technical" changes in requiring that all amendments and reports of conference committees meet the requirements of section 39 of Article III. *See Caples*, 102 S.W.2d at 176. Because the requirements were not met in this case, we hold that House Bill 2415 did not take immediate effect but went into force ninety days after the adjournment of the 78th Regular Session of the Texas Legislature. *See* TEX. CONST. art. III, § 39.

The judgment in this case was signed and became appealable prior to the effec-

---

**29.** In its reply brief, Bic appears to concede that Resolution 66 was not passed by the required two-thirds vote. *See* REPLY BRIEF OF APPELLANT, BIC PEN CORPORATION p. 21.

tive date of House Bill 2415. Therefore, the trial court did not err in refusing to apply House Bill 2415. Bic's eighth issue is overruled.

## V. Conclusion

The judgment of the trial court is affirmed.